**MOTION DAY: JANUARY 20, 2015**
**ORAL ARGUMENT REQUESTED**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **WAG ACQUISITION, L.L.C.,**<br><br>        Plaintiff,<br><br>v.<br><br>**SOBONITO INVESTMENTS, LTD., et al.**<br><br>        Defendants. | No.: **2:14-cv-01661-ES-JAD**<br><br>**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS** |
| **WAG ACQUISITION, L.L.C.,**<br><br>        Plaintiff,<br><br>v.<br><br>**MULTI MEDIA, LLC., et al.**<br><br>        Defendants. | No.: **2:14-cv-02340-ES-JAD** |
| **WAG ACQUISITION, L.L.C.,**<br><br>        Plaintiff,<br><br>v.<br><br>**DATA CONVERSIONS, INC., et al.**<br><br>        Defendants. | No.: **2:14-cv-02345-ES-JAD** |
| **WAG ACQUISITION, L.L.C.,**<br><br>        Plaintiff,<br><br>v.<br><br>**FLYING CROCODILE, INC., et al.**<br><br>        Defendants. | No.: **2:14-cv-02674-ES-MAH** |

| | |
|---|---|
| **WAG ACQUISITION, L.L.C.**, <br><br> Plaintiff, <br><br> v. <br><br> **GATTYÁN GROUP S.á r.l., et al.** <br><br> Defendants. | No.: **2:14-cv-02832-ES-JAD** |
| **WAG ACQUISITION, L.L.C.**, <br><br> Plaintiff, <br><br> v. <br><br> **MFCXY, INC., et al.** <br><br> Defendants. | No.: **2:14-cv-03196-ES-MAH** |
| **WAG ACQUISITION, L.L.C.**, <br><br> Plaintiff, <br><br> v. <br><br> **FRIENDFINDER NETWORKS, INC., et al.** <br><br> Defendants. | No.: **2:14-cv-03456-ES-JAD** |
| **WAG ACQUISITION, L.L.C.**, <br><br> Plaintiff, <br><br> v. <br><br> **VUBEOLOGY, INC., et al.** <br><br> Defendants. | No.: **2:14-cv-04531-ES-JAD** |

# TABLE OF CONTENTS

**PLAINTIFF'S BRIEF IN OPPOSITION  TO DEFENDANTS' JOINT MOTION TO DISMISS** .....1

    *A.*    *Background* ...................................................................................................................2

    *B.*    *Procedural History* .....................................................................................................4

    *C.*    *The Patented Technology* ..........................................................................................4

**ARGUMENT** .................................................................................................................................6

**POINT I.    TO DEFEAT DEFENDANTS' MOTION UNDER RULE 12(b)(6), WAG NEED ONLY SHOW THAT ITS DEMAND FOR RELIEF MEETS MINIMUM REQUIREMENTS** .........6

    *A.*    *"Form 18" Sets the Definitive Standard for Pleading Direct Infringement* .......................6

    *B.*    *Plaintiff's Other Claims Must Only Set Forth a "Short and Plain Statement of the Claim" That is "Facially Plausible"* .................................................................................7

    *C.*    *By Statute, U.S. Patents Must be Presumed Valid* .......................................................8

    *D.*    *Curative Amendment* .................................................................................................9

**POINT II.   CLAIMS 1-18 AND 24-28 OF THE '141 PATENT ARE NOT "UNENFORCEABLE"** .......................................................................................................................9

    *A.*    *Legal Standard for Unenforceability* ......................................................................10

    *B.*    *Defendants Fail to Establish a Material Omitted Limitation* .....................................11
        1.    Contrary to Defendants' Brief, There Was No "Rejection" ....................................11
        2.    The Issue was Not Material to the PTO ...............................................................12
        3.    Unlike *H-W Technology*, the PTO Error Here Does not Mistakenly Empower a Patentee With a Broader Patent ........................................................................................13

    *C.*    *Unenforceability Contentions are Premature on a Motion to Dismiss* ..........................14
        1.    Defendants' Argument Depends on Material Outside of the Pleadings .................15
        2.    A Finding of Indefiniteness Would Require Claim Construction, which is Incompatible with a Motion to Dismiss ...............................................................................16

**POINT III.     SECTION 101: DEFENDANTS IMPROPERLY DISREGARD THE INVENTIVE COMBINATION OF FEATURES FOUND IN WAG'S PATENTS TO ARGUE NON-PATENTABLE SUBJECT MATTER** ......................................................................................... 18

    *A.*    *Defendants' Motion Requires Claim Interpretation* ..................................................21

    *B.*    *The Supreme Court has Held that "Dissection" is an Improper § 101 Analysis* ..............22

    *C.*    *Defendants' Purported "Abstract Idea" of Sending Data Faster than the Playback Rate is Fundamentally Wrong and Results From an Improper Analysis* ..................................25

*D.    The Purpose of WAG's Patents Is to Provide Reliable Mechanisms to Transmit a Continuous Stream of Media Data Over an Inherently Faulty Medium* .......................................33

*E.    WAG's Patents Claim Specific Implementations and Do Not Purport to Cover All Systems For Providing Reliable and Timely Streaming Media Transport* ...................................34

*F.    WAG's Patent Claims Do Not Preempt the Field* ........................................................37

*G.    Technological Subject Matter Such as That Claimed in WAG's Patents Has Generally Been Found Patent Eligible.* ..........................................................................................40

*H.    Defendants' Arguments, If Accepted, Would Have the Effect of Making All Computer-Related Inventions Unpatentable, Beyond Anything the Supreme Court has Held and Contrary to the Intentions of Congress.* .........................................................................42

**POINT IV.    PLAINTIFF ADEQUATELY PLEADS DIRECT INFRINGEMENT** .......................44

*A.    Distinctions Among Direct, Induced, and Contributory Forms of Infringement* ............44

*B.    Plaintiff's Allegations of Direct Infringement are Legally Sufficient* ..................................46

1.    Defendants' Arguments Against Direct Infringement of Method Claims Are Premature As Requiring Claim Construction, and Flawed Because No Action By the User Is Required ....................................................................................................49

(a)    Defendants' Arguments Require Claim Construction and Are Therefore Premature ....................................................................................................49

(b)    Even If the Court Reaches Defendants' Arguments on WAG's Method Claims, None of the Claims Require Multiple Parties or Delivery of a Physical Medium With Software ....................................................................................................51

2.    Defendants' Arguments Against the System Claims are Similarly Premature and It is Clear in Any Case that Defendants "Use" their Own Systems ............................53

(a)    Defendants Clearly "Use" Their Own Servers as Claimed in Three of the Patents-In-Suit ...............................................................................................53

(b)    Defendants Overlook the Allegations that They Exercise Direction and Control Over Users' Players ............................................................................56

3.    Allegations That "Defendants" Commit Infringing Acts Is Not "Divided Infringement" ................................................................................................58

**POINT V.   PLAINTIFF ADEQUATELY PLEADS INDIRECT INFRINGEMENT** ........................61

*A.    WAG Has Sufficiently Alleged The Actions Of The Defendants In Each Case* ..................61

*B.    WAG Undisputedly Pleads Inducement of the Acts That Are Alleged to Constitute Direct Infringement* ....................................................................................................63

*C.    WAG Sufficiently Pleads Specific Intent to Cause Infringement* ...........................................64

*D.    Controlling Authority Holds that Knowledge Provided By The Complaint is Sufficient to Support a Claim for Induced Infringement* ........................................................................66

*E.    Plaintiff Sufficiently Pleads Contributory Infringement* ...........................................................69

**POINT VI.    PLAINTIFF ADEQUATELY PLEADS WILLFUL INFRINGEMENT** ....................71

**POINT VII.    WAG'S COMPLAINT SUFFICIENTLY ALLEGES JURISDICTION OVER DEFENDANT COOLVISION** ............................................................................................ 76

*A.    Legal Standards for Personal Jurisdiction*................................................................77

*B.    The SAC Alleges Sufficient Activities Related to the Alleged Infringement in New Jersey And Elsewhere in the U.S.*...............................................................................79

*C.    Express Admissions and Other Competent Evidence Clearly Support Jurisdiction Over Coolvision On the Basis of Its Responsibility for the Accused Websites*.......................80

*D.    Coolvision Purposefully Directed Activities at Residents of New Jersey and the United States*.....................................................................................................................89

*E.    The Assertion Of Personal Jurisdiction Is Reasonable And Fair* ..............................89

*F.    If The Court Concludes That WAG Has Not Made A Prima Facie Case for Personal Jurisdiction, It Must Be Permitted To Take Jurisdictional Discovery*.............................90

**POINT VIII.   WAG'S COMPLAINT SUFFICIENTLY ALLEGES JURISDICTION AND VENUE OVER DEFENDANT RADVINSKY AND HIS CORPORATIONS**.........................................91

*A.    WAG Sufficiently Alleges Specific Jurisdiction over The MFC Defendants* .....................91

1.    MFC Purposefully Directed Activities at Residents of New Jersey. ...................... 92
    (a)    MFC's Web Sites ......................................................................... 92
    (b)    MFC's Additional "Purposeful Availment" ................................................ 95
        i.    Sponsorship of New Jersey Trade Shows ................................................. 96
        ii.    Induced Infringement in New Jersey ................................................... 98
2.    WAG's Claims Arise Out Of or Relate to MFC's Activities. ............................... 98
3.    The Assertion of Personal Jurisdiction Is Reasonable And Fair. ......................... 99
4.    Mr. Radvinsky is Personally Subject to Jurisdiction ..................................... 99

*B.    Venue in This District is Proper*............................................................ 106

**CONCLUSION** ............................................................................................109

# TABLE OF AUTHORITIES

## Cases

*3D Sys., Inc. v. Formlabs, Inc.*,
 No. 13 Civ. 7973, 2014 WL 1904365 (S.D.N.Y. May 12, 2014) .....................68

*ACCO Brands, Inc. v. PC Guardian Anti-Theft Prods., Inc.*,
 592 F. Supp. 2d 1208 (N.D. Cal. 2008) ............................................................75

*Actus, LLC v. Bank of Am. Corp.*,
 No. 2-09-cv-102, 2010 WL 547183 (E.D. Tex. Feb. 10, 2010) ........................50

*Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*,
 261 F.3d 1329 (Fed. Cir. 2001) ........................................................................48

*Affinity Labs of Tex., LLC v. Alpine Elecs. of Am., Inc.*,
 No. 9:08-CV-171, 2009 WL 9091275 (E.D. Tex. Sept. 2, 2009) .....................75

*Akro Corp. v. Luker*,
 45 F.3d 1541 (Fed. Cir. 1995) .....................................................................78, 92

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
 134 S. Ct. 2347 (2014).............................................................................*passim*

*Ameranth, Inc. v. Genesis Gaming Solutions, Inc.*,
 No. SACV 11-00189 AG, 2014 WL 7012391
 (C.D. Cal. Nov. 12, 2014).................................................................20, 30, 32

*Apeldyn Corp. v. Sony Corp.*,
 852 F. Supp. 2d 568 (D. Del. 2012)..................................................................67

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
 365 U.S. 336 (1961)..........................................................................................45

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)......................................... 7, 8, 48, 74, 76, 77, 99

*Atmel Corp. v. Info. Storage Devices, Inc.*,
 198 F.3d 1374 (Fed. Cir. 1999) ........................................................................16

*Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*,
 566 F.3d 1012 (Fed. Cir. 2009) ...................................................................77, 78

*Automated Transactions, LLC v. First Niagara Fin. Grp., Inc.*,
 No. 10-CV-00407-A-M, 2010 WL 5819060 (W.D.N.Y. Aug. 31, 2010)..........68

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)................................................................7, 8, 47, 73, 75, 76

ii

*Beverly Hills Fan Co. v. Royal Sovereign Corp.*,
    21 F.3d 1558 (Fed. Cir. 1994) ................................................................78, 82, 83

*Bilski v. Kappos*,
    561 U.S. 593 (2010)................................................................20, 26, 32, 42

*Bird Barrier Am., Inc. v. Bird-B-Gone, Inc.*,
    No. SACV 09-0418 AG (RNBx), 2010 WL 761241 (C.D. Cal. 2010) ............15

*Buckley v. Abuzir*,
    8 N.E.3d 1166 (Ill. App. Ct. 2014) .................................................................105

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)................................................................77, 89, 99

*Cal. Inst. of Tech. v. Hughes Commc'ns. Inc.*,
    No. 2:13–cv–07245-MRP-JEM, 2014 WL 5661290
    (C.D. Cal. Nov. 3, 2014).............................................. 24, 25, 27, 28, 31, 32, 43

*Calder v. Jones*,
    465 U.S. 783 (1984)................................................................100

*Campbell Pet Co. v. Miale*,
    542 F.3d 879 (Fed. Cir. 2008) ........................................................83

*Capogrosso v. Sup. Ct. of N.J.*,
    588 F.3d 180 (3d Cir. 2009) ...........................................................8

*Centillion Data Sys., LLC v. Qwest Comm'ns Int'l Inc.*,
    631 F.3d 1279 (Fed. Cir. 2011) ..........................................................54, 55, 57

*Cima Labs, Inc. v. Actavis Grp. HF*,
    Civ. Nos. 07-893 (DRD), 06-1970 (DRD), 06-1999 (DRD),
    2007 WL 1672229 (D.N.J. June 7, 2007)...................................................16, 49

*Civix-DDI, LLC v. Cellco P'ship*,
    387 F. Supp. 2d 869 (N.D. Ill. 2005) .................................................89

*Clear with Computers, LLC v. Dick's Sporting Goods, Inc.*,
    No. 6:12-CV-674, 2014 WL 923280 (E.D. Tex. Jan. 21, 2014) ......................21

*Computer Assoc. Int'l, Inc. v. Altai, Inc.*,
    982 F.2d 693 (2d Cir. 1992) ...........................................................30

*Conley v. Gibson*,
    355 U.S. 41 (1957)................................................................8

*CreAgri, Inc. v. Pinnaclife Inc.,*
    No. 5:11-CV-06635, 2013 U.S. Dist. LEXIS 105952
    (N.D. Cal. July 29, 2013) ...................................................................64

*Cybersell, Inc. v. Cybersell, Inc.,*
    130 F.3d 414 (9th Cir. 1997) .............................................................93

*D.L. Auld Co. v. Park Electrochemical Corp.,*
    553 F. Supp. 804 (E.D.N.Y. 1982) ....................................................85

*Data Distrib. Techs. v. BRER Affiliates, Inc.,*
    No. 12–4878 (JBS/KMW), 2014 WL 4162765
    (D.N.J. Aug. 19, 2014)...................................................20, 21, 22

*DataQuill Ltd. v. High Tech Computer Corp.,*
    887 F. Supp. 2d 999 (S.D. Cal. 2011).................................................74

*DDR Holdings, LLC v. Hotels.com, L.P.,*
    No. 2013-1505 (Fed. Cir. Dec. 5, 2014)............................. 18, 19, 26, 28, 32, 41

*Deston Therapeutics LLC v. Trigen Labs. Inc.,*
    723 F. Supp. 2d 665 (D. Del. 2010)....................................................50

*Diamond v. Diehr,*
    450 U.S. 175 (1981)..................................................................*passim*

*DSU Med. Corp. v. JMS Co. Ltd.,*
    471 F.3d 1293 (Fed. Cir. 2006) .........................................45, 64, 65

*Eclipse IP LLC v. McKinley Equip. Corp.,*
    No. SACV 14–742–GW, 2014 WL 4407592 (C.D. Cal. Sept. 4, 2014)...........40

*Elcommerce.com, Inc. v. SAP AG,*
    745 F.3d 490 (Fed. Cir. 2014) ...........................................................84

*Enfish, LLC v. Microsoft Corp.,*
    No. 2:12–cv–07360, 2014 WL 5661456 (C.D. Cal. Nov. 3, 2014) .................25

*Englishtown, Inc. v. Rosetta Stone Inc.,*
    962 F. Supp. 2d 355 (D. Mass. 2013).........................................73, 74

*EON Corp. IP Holdings, LLC v. Sensus USA, Inc.,*
    No. C-12-1011 EMC, 2012 WL 4514138 (N.D. Cal. Oct. 1, 2012) .................67

*Execware, LLC v. Staples, Inc.,*
    Civ. Act. No. 11-836-LPS-SRF, 2012 WL 6138340
    (D. Del. Dec. 10, 2012)...................................................................67

*Fujitsu Ltd. v. Belkin Int'l, Inc.*,
  782 F. Supp. 2d 868 (N.D. Cal. 2011) .........................................................17, 49

*Fujitsu Ltd. v. Netgear Inc.*,
  620 F.3d 1321 (Fed. Cir. 2010) .........................................................................64

*Gass v. Anna Hosp. Corp.*,
  392 Ill. App. 3d 179, 911 N.E.2d 1084 (2009)................................................101

*Global-Tech Appliances, Inc. v. SEB S.A.*,
  131 S. Ct. 2060 (2011).......................................................................45, 64, 66, 80

*Graphic Controls Corp. v. Utah Med. Prods., Inc.*,
  No. 96-CV-0459E(F), 1997 WL 276232 (W.D.N.Y. May 21, 1997),
  *aff'd*, 149 F.3d 1382 (Fed. Cir. 1998)...............................................................83

*Hoover Grp., Inc. v. Custom Metalcraft, Inc.*,
  84 F.3d 1408 (Fed. Cir. 1996) ........................................................106, 107, 108

*H-W Tech. LC v. Apple, Inc.*,
  No. 3:11-cv-651-G-BH (N.D. Tex. May 28, 2013)...........................................17

*H-W Tech., LC v. Overstock.com, Inc.*,
  758 F.3d 1329 (Fed. Cir. 2014) .......................................................11, 13, 14, 17

*IMO Indus., Inc. v. Kiekert AG*,
  155 F.3d 254 (3d Cir. 1998) ..............................................................................77

*In re Auto. Refinishing Paint Antitrust Litig.*,
  No. 1426, 2002 WL 31261330 (E.D. Pa. July 31, 2002) ..................................90

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
  681 F.3d 1323 (Fed. Cir. 2012) .................................................................*passim*

*In re Seagate Tech., LLC*,
  497 F.3d 1360 (Fed. Cir. 2007) ....................................... 45, 71, 72, 73, 74, 75, 76

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945).............................................................................................96

*Jakks Pac., Inc. v. Conte*,
  No. CIV.A. 11-479 ES, 2011 WL 6934856 (D.N.J. Dec. 30, 2011)......77, 78, 94

*Joao Control & Monitoring Sys., LLC v. Digital Playground, Inc.*,
  No. 12-CV-6781 (S.D.N.Y. Nov. 8, 2013)..................................................59, 61

*Keeton v. Hustler Magazine, Inc.*,
  465 U.S. 770 (1984)......................................................................................97, 100

*K-Tech Telecomms., Inc. v. Time Warner Cable, Inc.*,
714 F.3d 1277 (Fed. Cir. 2013) ..................................................7, 47, 48, 61, 62

*Labyrinth Optical Tech., LLC v. Fujitsu Am., Inc.*,
No. 13-cv-00030 (C.D. Cal. Aug. 21, 2013) ....................................................67

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
134 S. Ct. 2111 (2014)................................................................................46, 59, 60

*Lottotron, Inc. v. Athila Station*,
No. CIV.A. 10-4318 JLL, 2011 WL 2784570 (D.N.J. July 11, 2011)..............86

*Lum v. Bank of Am.*,
361 F.3d 217 (3d Cir. 2004) ............................................................................15

*Mannatech, Inc. v. TechMedia Health, Inc.*,
No. 3:06-CV-00813-P, 2009 WL 3614359 (N.D. Tex. Oct. 29, 2009)..............18

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)............................16, 50

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
132 S. Ct. 1289 (2012)...............................................................................*passim*

*McDonald v. Frontier Lanes, Inc.*,
272 N.E.2d 369 (Ill. App. Ct. 1971) ......................................................100, 104

*McRO, Inc. v. Codemasters USA Group, Inc.*,
No. 14-CV-389-GW (FFMx), 2014 U.S. Dist. LEXIS 136361
(C.D. Cal. Sept. 22, 2014)......................................................................24, 38, 39

*McZeal v. Sprint Nextel Corp.*,
501 F.3d 1354 (2007).................................................................47, 59, 61, 62

*Merial Ltd. v. Cipla Ltd.*,
681 F.3d 1283 (Fed. Cir. 2012) ......................................................................78

*Microsoft Corp. v. AT&T Corp.*,
127 S. Ct. 1746 (2007)....................................................................................70

*Microsoft Corp. v. i4i Ltd. P'ship*,
131 S. Ct. 2238 (2011)..................................................................................9, 10

*Mike's Train House, Inc. v. Broadway Ltd. Imports, LLC*,
No. CIV. JKB-09-2657, 2011 WL 856306 (D. Md. Mar. 8, 2011)................107

*Minkus Elec. Display Sys. Inc. v. Adaptive Micro Sys. LLC*,
Civ. No. 10-666-SLR, 2011 WL 941197 (D. Del. Mar. 16, 2011) ..................67

*Minnesota Mining & Mfg. Co. v. Eco Chem, Inc.*,
  757 F.2d 1256 (Fed. Cir. 1985) ............................................................107, 108

*Muniauction, Inc. v. Thomson Corp.*,
  532 F.3d 1318 (Fed. Cir. 2008) ..................................................................46, 60

*Nat'l Acceptance Co. v. Pintura Corp.*,
  418 N.E. 2d 1114 (Ill. App. Ct. 1981) ...........................................................100

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014).......................................................................................14

*Noah Sys., Inc. v. Intuit Inc.*,
  675 F.3d 1302 (Fed. Cir. 2012) ........................................................................16

*NTP v. Research in Motion, Ltd.*,
  418 F.3d 1282 (Fed. Cir. 2005) ........................................................................55

*O'Reilly v. Morse*,
  56 U.S. 62 (1854)...............................................................................................40

*OpenTV, Inc. v. Netflix Inc.*,
  No. 14-cv-01526-RS (N.D. Cal. Dec. 16, 2014) .......................................41, 42

*Oticon, Inc. v. Sebotek Hearing Sys., LLC*,
  865 F. Supp. 2d 501 (D.N.J. 2011) ...................................................................93

*Oy Ajat, Ltd. v. Vatech America, Inc.*,
  No. 10-CV-4875, 2011 WL 1458052 (D.N.J. Apr. 14, 2011)...........................67

*Pactool Int'l Ltd. v. Kett Tool Co.*,
  No. C06-5367, 2011 WL 834151 (W.D. Wash. Mar. 3, 2011).........................98

*Patent Rights Prot. Grp., LLC v. Video Gaming Techs., Inc.*,
  603 F.3d 1364 (Fed. Cir. 2010) ........................................................................99

*Phillips v. County of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ...............................................................................9

*Progressive Cas. Ins. Co. v. Safeco Ins. Co.*,
  No. 1:10 CV 1370, 2010 WL 4698576 (N.D. Ohio Nov. 12, 2010) ................15

*Quality Int'l Packaging, Ltd. v. Chamilia Inc.*,
  No. 13–5235, 2014 WL 2465262 (D.N.J. May 30, 2014)..................................90

*Rembrandt Soc. Media, LP v. Facebook, Inc.*,
  950 F. Supp. 2d 876 (E.D. Va. 2013) ................................................................68

*Richmond v. Lumisol Elec. Ltd.*,
  No. 13–1944, 2014 WL 1405159 (D.N.J. Apr. 10, 2014)...........................60, 61

*S. Cross Overseas Agencies v. Wah Kwong Shipping Grp.*,
 181 F.3d 410 (3d Cir. 1999) ............................................................15

*Schindler Elevator Corp. v. Otis Elevator Co.*,
 No. 09-CV-0560(DMC), 2010 WL 1032651 (D.N.J. Mar. 16, 2010) ..............67

*Schreiber v. Eli Lilly & Co.*,
 No. 05CV2616, 2006 WL 782441 (E.D. Pa. Mar. 27, 2006)............................49

*Silent Drive, Inc. v. Strong Indus., Inc.*,
 326 F.3d 1194 (Fed. Cir. 2003) ....................................................78, 83

*SiRF Tech., Inc. v. Int'l Trade Commission*,
 601 F.3d 1319 (Fed. Cir. 2010) ...............................................51, 57, 58

*Smartwater, Ltd. v. Applied DNA Scis., Inc.*,
 No. 12-CV-5731(JS), 2013 WL 5440599 (E.D.N.Y. Sept. 27, 2013) ..............68

*SoftView LLC v. Apple Inc.*,
 Civ. Act. No. 10-389-LPS, 2012 WL 3061027 (D. Del. July 26, 2012)............67

*Soverain Software LLC v. J.C. Penney Corp.*,
 899 F. Supp. 2d 574 (E.D. Tex. 2012)....................................55, 57, 58

*State Contracting & Eng'g Corp. v. Condotte Am., Inc.*,
 346 F.3d 1057 (Fed. Cir. 2003) ........................................................9

*Symantec Corp. v. Veeam Software Corp.*,
 No. C 12-00700 SI, 2012 WL 1965832 (N.D. Cal. May 31, 2012) ..................70

*Therasense, Inc. v. Becton, Dickinson & Co.*,
 649 F. 3d 1276 (Fed. Cir. 2011) ........................................9, 10, 13, 14

*Tower Investors LLC v. 111 E. Chestnut*,
 864 N.E.2d 927 (Ill. App. Ct. 2007) ................................................101

*Toys "R" Us, Inc. v. Step Two, S.A.*,
 318 F.3d 446 (3d Cir. 2003) ..........................................90, 92, 93, 95

*Trading Techs. Int'l, Inc. v. BCG Partners, Inc.*,
 No. 10 C 715, 2011 WL 3946581 (N.D. Ill. Sept. 2, 2011) ...............................69

*Trans Video Elecs., Ltd. v. Netflix, Inc.*,
 Civ. Act. No. 12-1743-LPS, 2014 WL 900929 (D. Del. Mar. 4, 2014)............66

*Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.*,
 395 F.3d 1275 (Fed. Cir. 2005) ........................................................93

*Uniloc USA, Inc. v. Microsoft Corp.*,
 632 F.3d 1292 (Fed. Cir. 2011) ........................................................52

*Veteran Supply Corp. v. Swaw,*
  548 N.E.2d 667 (Ill. App. Ct. 1989) ................................................................100

*Walker Digital LLC v. Facebook Inc.,*
  852 F. Supp. 2d 559 (D. Del. 2012)............................................................66, 67

*WesternGeco L.L.C. v. Ion Geophysical Corp.,*
  776 F. Supp. 2d 342 (S.D. Tex. 2011)...................................................58, 61, 62

*Wolf v. Capstone Photography, Inc.,*
  No. 2:13-CV-09573, 2014 U.S. Dist. LEXIS 156527
  (C.D. Cal. Oct. 28, 2014) ......................................................................20

*Yangaroo Inc. v. Destiny Media Techs. Inc.,*
  No. 09–C–462, 2009 WL 2836643 (E.D. Wis. Aug. 31, 2009) .......................50

*Zing Bros., LLC v. Bevstar, LLC,*
  No. 2:11-cv-00337 DN, 2011 WL 4901321 (D. Utah Oct. 14, 2011) ..............93

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.,*
  952 F. Supp. 1119 (W.D. Pa. 1996).............................................92, 93, 95

*Zond, Inc. v. Fujitsu Semiconductor Ltd.,*
  990 F. Supp. 2d 50 (D. Mass. 2014) .................................................68

*Zond, LLC v. Renesas Elecs. Corp.,*
  No. 13-11625-NMG, 2014 U.S. Dist. LEXIS 114363 (D. Mass.,
  Aug. 15, 2014) ......................................................................75

*Zumbro, Inc. v. Cal. Nat'l Prods., Inc.,*
  861 F. Supp. 773 (D. Minn. 1994)...........................................................95

## Statutes

17 U.S.C. § 102(b) ......................................................................30

28 U.S.C. § 1391(c) ............................................................106, 107

28 U.S.C. § 1400(b) ...........................................................106, 107

35 U.S.C. § 101 ...................................................................*passim*

35 U.S.C. § 112 ...............................................12, 14, 16, 17

35 U.S.C. § 271(a) .............................................7, 44, 46, 59, 60

35 U.S.C. § 271(b) ....................................44, 45, 59, 64, 69

35 U.S.C. § 271(c) ..........................................45, 69, 70

35 U.S.C. § 271(f) ..................................................................70

35 U.S.C. § 282(a) ........................................................................9

Leahy-Smith America Invents Act, Pub. L 112-29, 125 Stat 284 (2011) ..............43

**Rules and Regulations**

37 C.F.R. § 1.104 ........................................................................11

Fed. R. Civ. P. 4(k)(2).................................................................78

Fed. R. Civ. P. 84 .................................................................6, 7, 46

Fed. R. Civ. P., Form 18 .............................................3, 6, 7, 46, 47, 48

L. Civ. R. 9.3 ...........................................................................16

L. Pat. R. 3.1 ...........................................................................47

**Additional Authorities**

M.P.E.P. § 2173.02 ....................................................................13

Restatement (Third) of Agency (2006) § 7.03 ...............................85, 100

## PLAINTIFF'S BRIEF IN OPPOSITION
## TO DEFENDANTS' JOINT MOTION TO DISMISS

Plaintiff accuses the Defendants in these cases of infringing Plaintiff's patents on Internet streaming media delivery technology.  The Defendants as a group include the world's largest websites for live, paid, adult "web cam" performances.  Plaintiff has alleged that Defendants use and rely on Plaintiff's patented technology to stream video in high volume with no compensation to Plaintiff.

Defendants have jointly moved, in one preemptive motion, to dismiss all of the claims before the Court and to dismiss all of the Plaintiff's actions.  Defendants look for alleged defects in the patents as their principal line of defense.  They selectively grasp at a succession of recent cases that have been decided in diverse procedural postures (including after trial), hoping to find a "silver bullet" that will give them an immediate exit before any proceedings on the merits.  None of the "silver bullet" cases that Defendants urge on the Court fit the facts here. Defendants have failed to show that they are entitled to an easy exit prior to addressing the merits.

High on Defendants' list of contentions is the argument that Plaintiff's inventions cannot even be legally protected.  However, unlike long-practiced business methods that someone has merely automated on a computer, the claims at issue here are deeply rooted in computer technology and apply that technology in specifically defined ways to solve problems of reliable data transmission over

computer networks.  No court has ever held such a patent invalid for unpatentable subject matter.

Two of the Defendants make jurisdictional arguments.  One of these Defendants, Coolvision, Ltd., suggests that it can conduct an infringing Internet business in the United States without regard for U.S. patent laws, so long as it "pulls the levers" to operate the business from offices outside this country. Coolvision would have the Court overlook the legal authority that exerting such control — irrespective of where the control is exercised — is the very thing that makes a party an infringer.  The other Defendants challenging jurisdiction are the operators of the MyFreeCams website, including their principal, Leonid Radvinsky.  Mr. Radvinsky seeks to avoid jurisdiction and venue by hiding behind corporations that have a long record of serving as insubstantial fronts for him, as well as a long record of conduct in New Jersey related to the alleged infringement.

The remainder of Defendants' arguments are piecemeal and unpersuasive. Even assuming, *arguendo*, that such arguments were successful, they would not be dispositive of even one of the present cases.  As the following will demonstrate, each of these piecemeal dismissal arguments is also flawed.  Defendants' motion must be denied in its entirety.

## A. Background

WAG is a New Jersey business that provides Internet streaming services to proprietors of traditional radio stations – retransmitting ("streaming") the radio station's live programming over the Internet, which is separate from the station's regular "over-the-air" radio broadcast.  WAG and its predecessor entities have

operated this business continuously since 1998, and WAG continues in that business to the present date.

In the course of its radio streaming business, WAG invested in research and development to improve the then current techniques for streaming over the Internet.  WAG's goal was to provide an Internet radio experience that would seem just like broadcast radio, with an instantaneous program startup when an Internet "radio" channel is clicked on by the user, and smooth, uninterrupted delivery while the user is listening to the program.  WAG developed technology that successfully provides that experience.  WAG applied for and obtained a number of patents on its developments.

WAG currently practices under the claims of two of the four patents-in-suit (the '611 and '839 patents discussed below).  WAG's streaming media patents (the four patents-in-suit and three others) represent solutions to the technological problems that WAG identified in its business.  At the same time, the patented technology has uses well beyond WAG's business of streaming broadcast radio.

Defendants primarily operate paid live "web cam" sites on the Internet.[1] This has become a concentrated industry, and the world's largest players are represented among the Defendants, with hundreds of millions of dollars in revenues from infringing services.  The paying customers for these services are to

---

[1] Defendant AEBN provides prerecorded adult "video on demand" (VOD), and Defendant Vubeology, Inc., which is commonly owned with one of the "web cam" Defendants (Flying Crocodile, *et al.*), operates a video sharing site with general audience content.

a large extent in the U.S.  To reach the U.S. customers with streaming services, Defendants use powerful streaming media servers situated in the U.S.

The technology Defendants use to stream their video is WAG's technology, covered by the patents-in-suit.  Defendants infringe those patents, as do their customers, who are induced (and indeed, caused) to do so, through the servers that the Defendants operate.  While WAG and Defendants do not compete with each other in their respective businesses, which address completely different markets and categories of customers, Defendants' businesses are entirely reliant on technology developed and patented by WAG.  Thus, Defendants continuously infringe WAG's patents.

## B. Procedural History

The actions before the Court on this motion were filed over the period of March to July 2014.  After an initial round of motions, Plaintiff amended some of the earlier complaints.

In all cases, Defendants have been aware for at least many months that their conduct infringes WAG's patents.  Notwithstanding this knowledge, they each continue full bore with their infringing activities, in complete disregard of WAG's rights.

## C. The Patented Technology

WAG has obtained seven patents on the streaming technology it developed. This action concerns Defendants' infringement of four of those patents: U.S. Pat. Nos. 8,122,141 (the '141 patent), 8,327,011 (the '011 patent), 8,185,611 (the '611 patent), and 8,364,839 (the '839 patent).

All of WAG's streaming media patents address the problem of how to deliver a high-bandwidth stream of media reliably over the Internet, which is inherently a faulty network.  Information sent over the Internet takes the form of discrete packets of data.  Although ordinary users expect the Internet to be dependable, the mechanisms provided by the Internet Protocol do not guarantee timely delivery of those packets of data.  WAG's technologies overcome these limitations so that a stream can be delivered to the human user (*i.e.*, the program listener or viewer) without startup delays or interruptions.  Reliable streaming of live media is a make-or-break issue for WAG's radio station customers – just as it is for Defendants, whose various live and high-definition streaming services benefit tremendously from the improved delivery provided by the technology covered by WAG's patents.

WAG's patents provide two separate and distinct types of solutions to the problem of reliable and timely Internet media transport.  WAG's '839 and '611 patents provide one solution (referred to herein as the "Buffering" implementation), in which data flow is mediated from the server.  WAG's '141 and '011 patents provide a different solution (referred to herein as the "Pull" implementation), in which the server regulates the data flow based on receiving requests from the client.  The particulars of these implementations are addressed at greater length in the Argument below.

Three of the patents-in-suit have claims that cover servers *per se*, and by operating their servers, Defendants infringe a number of these claims.  In addition, some claims also separately cover the player apparatus.  As to that subset of claims

("player claims"), Defendants are liable for indirect infringement by causing their users to infringe.  In addition, Defendants' servers send electronic commands to the players in a manner that asserts control over the players and makes the Defendants directly liable for infringing the player claims as well.

Defendants have known of these patents and the detailed infringement allegations for many months or more, and they have not at all modified their infringing conduct.  Defendants either know they are infringing or do not care if they are.  In seeking outright dismissal of Plaintiff's claims for willful infringement, Defendants are asking the Court to relieve them of increased exposure for intentionally or recklessly taking this risk, over and above the royalty that Defendants would have to pay for the licensed use of WAG's technology. WAG submits that to extend such a "free pass" for willful, continuing infringement would be fundamentally unjust.

## ARGUMENT

**POINT I.   TO DEFEAT DEFENDANTS' MOTION UNDER RULE 12(b)(6), WAG NEED ONLY SHOW THAT ITS DEMAND FOR RELIEF MEETS MINIMUM REQUIREMENTS**

### A. "Form 18" Sets the Definitive Standard for Pleading Direct Infringement

The Federal Rules of Civil Procedure contain an appendix of forms, illustrating how certain causes of action may be sufficiently pleaded.  Federal Rule 84 states that "[t]he forms in the Appendix suffice under these rules and illustrate the simplicity and brevity that these rules contemplate."  Fed. R. Civ. P. 84.  One

of the forms is Form 18, provided specifically to plead direct infringement of a patent under 35 U.S.C. § 271(a).  The Federal Circuit, citing Rule 84, has repeatedly found pleadings that conform to the extremely simple format of Form 18 sufficient for purposes of pleading direct infringement.  That court has also held that Form 18 trumps *Twombly* and *Iqbal*[2] to the extent there might be any conflict therewith with regard to direct infringement.  *K-Tech Telecomms., Inc. v. Time Warner Cable, Inc*., 714 F.3d 1277, 1283 (Fed. Cir. 2013); *In re Bill of Lading Transmission & Processing Sys. Patent Litig.,* 681 F.3d 1323, 1334 (Fed. Cir. 2012).

## B. Plaintiff's Other Claims Must Only Set Forth a "Short and Plain Statement of the Claim" That is "Facially Plausible"

In addition to claims for direct infringement, Plaintiff has also asserted counts for induced infringement, contributory infringement, and willful infringement.  These allegations must be evaluated with reference to *Twombly* and *Iqbal*.  *Bill of Lading*, 681 F.3d at 1336-37 ("because Form 18 addresses only direct infringement, we must look to Supreme Court precedent for guidance regarding the pleading requirements for claims of indirect infringement").

Rule 8(a)(2) provides that a complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  The complaint must give the defendant "fair notice" of the claim "and the grounds upon

---

[2] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), are discussed below.

which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

While *Twombly* and *Iqbal* teach that the Court is not bound by the ultimate conclusions pleaded in a complaint, it must nevertheless perform the task of identifying the factual allegations asserted to support the conclusions, accept those facts as true, and determine if they support a plausible inference of entitlement to relief.  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.  A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.  If the claim is thus "plausible on its face," a motion to dismiss should not be granted. *Twombly*, 550 U.S. at 570.

A court must also "draw all reasonable inferences" from the allegations of the complaint in favor of the non-moving party.  *Capogrosso v. Sup. Ct. of N.J.*, 588 F.3d 180, 184 (3d Cir. 2009).  A court cannot weigh such inferences or decide which to accept.  "Nothing in *Twombly* or its progeny allows a court to choose among competing inferences as long as there are sufficient facts alleged to render the non-movant's asserted inferences plausible." *Bill of Lading,* 681 F.3d at 1340.

## C. By Statute, U.S. Patents Must be Presumed Valid

Defendants also move on the basis that WAG's patents are invalid and/or unenforceable.  In ruling on motions on those grounds, the Court must also give effect to the statutory presumption of validity.  "A patent shall be presumed valid. .

. . The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282(a).  Further, in determining the § 101 eligibility of a patent, its "claims *must be considered as a whole*."  *Diamond v. Diehr*, 450 U.S 175, 188 (1981) (emphasis added); *see also Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1304 (2012) ("patent claims must be considered as a whole") (quoting *Diehr*, 450 U.S at 188)).

Moreover, a party seeking to overcome the presumption of patent validity must also do so by clear and convincing evidence.  *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2245-46 (2011); *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1067 (Fed. Cir. 2003).  The same presumptions and burden apply to contentions that a patent is unenforceable.  *See Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F. 3d 1276, 1291 (Fed. Cir. 2011) (*en banc*).

**D. Curative Amendment**

WAG's complaints in these cases clearly exceed these standards. Nonetheless, if the Court finds that any count is insufficiently pled, Plaintiff is entitled to amend its complaint to allege facts that will cure the defect.  *Phillips v. Cnty of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

### POINT II.   CLAIMS 1-18 AND 24-28 OF THE '141 PATENT ARE NOT "UNENFORCEABLE"

Defendants lead with an argument regarding "unenforceability" — that a minor printing error in specific claims of one patent should preclude enforcement of those claims as issued.  Defendants' argument misstates the facts of the cases

before the Court and misstates the holding of the sole case they rely upon for authority.  Defendants also avoid addressing the key issue of ***materiality***, which defeats their argument.  The "plausibility" standard for testing a complaint for sufficiency of the pleading, as well as the presumption of validity, are ignored. Moreover, even if Defendants' unenforceability argument was not completely undermined by those defects, it only addresses a subset of the claims in one of the four patents-in-suit and would not reduce Defendants' liability.

## A. Legal Standard for Unenforceability

"Unenforceability" describes a situation where a patent, under circumstances in which it must be accepted as statutorily valid, is nevertheless judicially determined not to be entitled to legal enforcement, because of some extraordinary irregularity in its procurement or assertion, such as fraud established by clear and convincing evidence.  *See, e.g.*, *Therasense*, 649 F. 3d 1276.[3]

*Therasense* and innumerable other cases stand for the proposition that, at a minimum, any circumstances that would justify a court not to enforce an issued patent that is otherwise presumed valid must be of a highly ***material*** nature.  The watershed *Therasense* decision drove this point home in the most emphatic terms, stating "materiality" for holding a patent unenforceable requires circumstances that would "injure the public."  *Id*. at 1292.  Materiality is axiomatic in any determination not to enforce an otherwise valid outstanding patent.

---

[3] "Unenforceability" differs from "invalidity."  "Invalidity" concerns a patent that does not meet one or more statutory requirements, as established in court by clear and convincing evidence.  *See i4i*, 131 S. Ct. at 2245-46.

The sole authority that Defendants rely on is *H-W Tech. LC v. Overstock.com, Inc.,* 758 F.3d 1329 (Fed. Cir. 2014).  Defendants mischaracterize this case.  Their purported statement of its holding is as follows: that "claims in an issued patent that are not the allowed claims — *e.g.*, ***do not reflect the claim language as allowed by the PTO*** — are not enforceable as a matter of law." (Defendants' Brief ("DBR") at 8 (emphasis added).)[4]

This is a misstatement, because the case actually holds something considerably narrower.  It states:

> When, as here, a claim issues that ***omits a material limitation***, and such omission is not evident on the face of the patent, the patentee cannot assert that claim until it has been corrected by the PTO.

*H-W Tech.*, 758 F.3d at 1335 (emphasis added).  The problem here (for Defendants) is that, unlike *H‑W Technology*, the minor PTO error here did not "omit" a limitation at all, and certainly not a limitation that was "material."

## B. Defendants Fail to Establish a Material Omitted Limitation

### 1.  Contrary to Defendants' Brief, There Was No "Rejection"

To lend an impression of materiality, Defendants falsely state that the PTO "rejected" WAG's application because of the "such as the internet" wording.  *See* DBR at 2, 6, 7 (repeatedly referring to the PTO's action with respect to the "such as" wording as a "rejection").  This is incorrect.  The term "rejection" has a specific meaning in patent law, *i.e.*, that the Examiner found the wording at issue to run afoul of statutory requirements.  *See* 37 C.F.R. § 1.104.  ***Such a "rejection"***

---

[4] "PTO" means the United States Patent and Trademark Office.

***never occurred*** in the prosecution of this patent.  In fact, the one and only official action prior to the allowance of this patent did not raise any issue whatsoever with the "such as the internet" wording.  Declaration of Ronald Abramson ("Abramson Decl."), Ex. 1, Nov. 24, 2010 Office Action from the '141 Prosecution History, at 8.

In an Interview Summary provided with the Notice of Allowance, the Examiner noted that he had "suggested" (his word) an "examiner's amendment" (*i.e.*, his own amendment), during a telephonic interview with the applicant's patent attorney.  Declaration of Michael A. Innes in Support of Defendants' Joint Motion to Dismiss ("Innes Decl."), Ex. 5, '141 Patent Notice of Allowance at 5. The Interview Summary reports a discussion concerning "***potential*** 112 issues."[5] *Id.* (emphasis added).  The accompanying Examiner's Amendment set forth the following amendment to claims 1, 10, and 24: " . . . data communications medium ~~such as the internet~~ . . . "  *Id.* at 7-9.

### 2.  The Issue was Not Material to the PTO

What occurred in the prosecution of this patent reflects the instructions of the PTO to its examiners, which further reflect that the PTO itself does not treat such issues as sufficiently material to hold up the issue of a patent.

The PTO's Manual of Patent Examining Procedure ("M.P.E.P.") instructs examiners that if they feel a rejection based on Section 112 is not appropriate, but

---

[5] 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor . . . regards as the invention.").

believe "that the clarity and the precision of the language can be improved by the deletion of the phrase 'such as' in the claim, the examiner may make such a *suggestion* to the applicant."  M.P.E.P. § 2173.02 (emphasis added).  That is exactly what happened here – a situation involving "such as" wording, which did not rise to the level that warranted a "rejection," triggered a "suggestion" instead.

Significantly, the M.P.E.P. then goes on to state: "[i]f applicant does not accept the examiner's suggestion, the examiner should not pursue the issue." *Id.*  In other words, the PTO has stated in its own operating manual that it will issue the patent *notwithstanding* failure to accept the examiner's suggested.  Such a situation, where "the patent would have issued anyway" (*Therasense*, 649 F.3d at 1292), plainly does not meet the threshold level of materiality for unenforceability.

### 3.  Unlike *H-W Technology*, the PTO Error Here Does not Mistakenly Empower a Patentee With a Broader Patent

In *H-W Technology*, the patent in question issued minus an entire claim step of a method claim, *i.e.*, absent one of the steps that was supposed to have been recited as comprising the claimed method.  By omitting an entire claim step, the patent as printed did not on its face require performance of that step in order to infringe, and thus was much *broader* on its face than what the applicant was entitled to.  The court readily found the error "material," expressly noting that the patent owner had conceded as much during oral argument.  *H-W Tech.*, 758 F.3d at 1334-35.  The court also noted that allowing such a patent to be enforced "would undermine the public notice function of patents" (*id.*), in other words injure the

public (*see Therasense*, *supra*) by seeming to give notice of a broader patent than anything the patent applicant was entitled to.

What took place in the present case is not even remotely comparable, and indeed is the opposite in its effect, from what took place in *H-W Technology*. Here, there was no omitted "material limitation," and thus no improper broadening of a patent.  In this case, the wording in question is a phrase ("such as the internet") that serves only to qualify, *i.e.*, limit the scope of, the phrase that it modifies ("data communications medium").  The "error" was not that this qualifying language was "omitted," but that it was left in.  The effect of this error could only be to make the issued claim narrower, not broader.  The absence here of a broadening error is a huge distinction.  Unlike *H-W Technology*, where materiality was conceded, it is ***not*** conceded here, and the basis for finding materiality does not exist.

## C. Unenforceability Contentions are Premature on a Motion to Dismiss

Defendants' brief recites that the Examiner stated there "may" be an indefiniteness issue under 35 U.S.C. § 112, but never argues this point itself.[6] Indeed, any determination that sought to resolve such an issue would be premature at this stage.

---

[6] Defendants have not even cited the Supreme Court's recent definitive ruling on indefiniteness, *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014), or made any argument seeking to apply that case or otherwise argue that the claims in question are invalid for indefiniteness.  The inquiry under *Biosig* "trains on the understanding of a skilled artisan at the time of the patent application" (*id.* at 2130) — a subject far beyond what can be adjudicated on a motion to dismiss.

### 1. Defendants' Argument Depends on Material Outside of the Pleadings

As a threshold matter, the Court should note that Defendants' entire unenforceability argument begins with a discussion of the prosecution history of the '141 patent, introduced via an affidavit, and plainly outside of the pleadings. Defendants suggest that the Court "may" take judicial notice of these documents. DBR at 7 & n.15. While it is true that the Court can judicially notice the fact of a government record, it cannot take notice of the import of its contents. *Lum v. Bank of Am.*, 361 F. 3d 217, 221 n.3 (3d Cir. 2004) (court "may take judicial notice [of prior official document] on a motion to dismiss only to establish [its] existence . . . , not for the truth of the facts asserted . . . "); *S. Cross Overseas Agencies v. Wah Kwong Shipping Grp.*, 181 F. 3d 410, 427 (3d Cir. 1999) (whether a court may judicially notice other proceedings depends on what the court is asked to notice and on the circumstances of the instant case). The Court cannot do anything with the information from the prosecution history proffered in this case without evaluating what the debated phrase means, or its effect on the definiteness of the claims. Such an inquiry would inevitably take the Court beyond the framework of a motion to dismiss. *See, e.g., Progressive Cas. Ins. Co. v. Safeco Ins. Co.*, No. 1:10 CV 1370, 2010 WL 4698576, at *4 n.1 (N.D. Ohio Nov. 12, 2010) ("it would be inappropriate for the Court to consider claim construction or matters outside the pleadings such as the prosecution history on a 12(b)(6) motion"); *Bird Barrier Am., Inc. v. Bird-B-Gone, Inc.*, No. SACV 09-0418 AG (RNBx), 2010 WL 761241, at *4 (C.D. Cal. Mar. 1, 2010) (declining to consider prosecution history

on the basis of judicial notice); *see also Cima Labs, Inc. v. Actavis Grp., HF*, No. 07-893 (DRD), 2007 WL 1672229, at \*4 (D.N.J. June 7, 2007) ("Plaintiff's response to the PTO's office action is not integral to or explicitly relied upon in the Complaint.  Therefore, this document will not be considered" on a motion to dismiss).

### 2. A Finding of Indefiniteness Would Require Claim Construction, which is Incompatible with a Motion to Dismiss

"A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1378 (Fed. Cir. 1999).  "A claim must be construed before determining its validity just as it is construed before deciding infringement." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 997 n.7 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).  "Whether a claim complies with the definiteness requirement of 35 U.S.C. § 112 ¶ 2 is a matter of claim construction . . . " *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012).

Claim construction, of course, is the subject of a series of Local Patent Rules that do not come into play until ***well after*** the motion to dismiss stage.  L. Civ. R. 9.3.  The Local Patent Rules set out a very detailed and specific set of actions to be performed to create a record sufficient for the court to pass upon the meaning of patent claims in dispute.

Defendants' brief completely ducks the issue of the necessity of claim construction, and would have the Court jump the gun on the directly applicable

Local Rules.  Of course, construction *would* be necessary in order to grant Defendants' motion, and it is unheard of to engage in such construction without all of the other measures and factual development required in order to make a proper ruling on the merits.

"The purposes of claim construction differ from the purposes of motions to dismiss for failure to state a claim."  *Fujitsu Ltd. v. Belkin Int'l, Inc.,* 782 F. Supp. 2d 868, 889 n.21 (N.D. Cal. 2011).  Plaintiff is aware of no case authority – and Defendants have cited none – which holds that an action on a patent claim may be dismissed under Rule 12(b)(6), prior to a claim construction hearing, based on invalidity of the claim for indefiniteness under 35 U.S.C. § 112  ¶ 2.

As noted, Defendants rely entirely on *H-W Technology, supra*.  Defendants fail to note that *H-W Technology* itself was decided in a procedural context of summary judgment *after* a claim construction hearing.  758 F.3d at 1331.  Thus, the procedural background of the sole case that Defendants cite completely contradicts the contention that they can rely on that case in the context of a motion to dismiss.

Moreover, Defendants fail to note that in parallel litigation against Apple, Amazon, and others on the same patent that was at issue in *H-W Technology*, the Texas court directly addressed whether it could rule on the validity of the claims involved in that case on a mere 12(b)(6) motion – ***and decided that it could not***. *H−W Tech. LC v. Apple, Inc*., No. 3:11-cv-651-G, slip op. at 8 (N.D. Tex. May 28, 2013) ("As a ruling on claim construction is still outstanding, the Court should decline to address Defendants' indefiniteness argument upon the present record

and at this particular stage") (citing *Mannatech, Inc. v. TechMedia Health, Inc.,* No. 3:06-CV-00813-P, 2009 WL 3614359, at *15 (N.D. Tex. Oct. 29, 2009) (determination of claim indefiniteness is not appropriate at the claim construction stage because "a court must first attempt to determine what a claim means before it can determine whether the claim is invalid for indefiniteness.")).

Defendants could not, therefore, rely on indefiniteness on the present motion. Instead, they opt for unenforceability, but lack the basis to establish a material omitted limitation. This branch of their motion must therefore be denied.

**POINT III.   SECTION 101: DEFENDANTS IMPROPERLY DISREGARD THE INVENTIVE COMBINATION OF FEATURES FOUND IN WAG'S PATENTS TO ARGUE NON-PATENTABLE SUBJECT MATTER**

This past year has seen a succession of cases, led by the Supreme Court's June ruling in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), addressing the scope of patent-eligible subject matter under 35 U.S.C § 101. The initial cases in this line dealt primarily with "business method" patents. More recent cases have addressed software and network-related technologies, and have accepted those patents that provided an inventive solution to a problem in a technical realm. The latter line of cases includes recent district court decisions upholding such patents, and a very recent decision by the Federal Circuit in *DDR Holdings v. Hotels.com*, upholding patents on a computer system for an outsourcer

adapted to generate composite web pages from different sets of source materials. *DDR Holdings, LLC v. Hotels.com, L.P.*, No. 2013-1505 (Fed. Cir. Dec. 5, 2014).

The Defendants here seek to have the Court analyze the patents in this case as if they only automated known, pre-technological business methods, such as the financial escrow arrangement involved in *Alice*.  But the patents involved in this case are qualitatively different in the technological nature of the problems that they address, in the specialized hardware elements used to implement them, and in the specific nature of the solutions they provide.

While *Alice* instructs courts to look critically at inventions and what they seek to accomplish, the Defendants would have the Court look ***past*** the invention, to the point of disregarding its inventive substance and implementation.  Since "invention" often lies in a unique ***combination*** of elements, it is easy to lose sight of an invention by mechanistically dissecting the elements and attacking them individually.  That is what Defendants have done, and more than one court has pointed out that it is improper to do so.

Defendants' approach for tearing patents down to their individual constituent elements would work to eviscerate virtually ***any*** patent.  If generally adopted, it would certainly wipe out all computer- and software-related patents, which is obviously beyond what was intended by either the Supreme Court or Congress.

Further, the factor of "preemption" that motivated the Supreme Court's recent § 101 decisions is absent here.[7]  As Defendants themselves acknowledge

---

[7] *See, e.g., Alice,* 134 S. Ct. at 2358 ("the pre-emption concern . . . undergirds our

(DBR at 9, n.18), the *Bilski*, *Mayo*, and *Alice* trilogy of recent § 101 cases from the
Supreme Court all reflect judicial caution against erecting patent barriers so broad
and conceptually sweeping that they become an instrument to inhibit rather than
incentivize further innovation.  One key factor that distinguishes WAG's patents
from those that were found to run afoul of § 101, is that WAG's patents claim
***specific implementations*** to solve an identified technological problem, and, unlike
cases that Defendants cite in support of their argument, would not preempt ***any***
***and all solutions*** to the problem.  WAG's patents, because they are directed at
specific solutions, leave other solutions available, including alternate approaches
that are widely used and under continued active development in the industry.
WAG's patents thus do not blanket an entire field of endeavor and do not trigger a
preemption concern.

    As noted above, patents are entitled to a presumption of validity, to be
overcome only based on clear and convincing evidence.  This heavy presumption
applies to challenges under § 101.  *See, e.g.*, *Data Distribution Techs. v. BRER*
*Affiliates, Inc.*, No. 12–4878 (JBS/KMW), 2014 WL 4162765, at *8 (D.N.J. Aug.
19, 2014); *Ameranth, Inc. v. Genesis Gaming Solutions, Inc.*, No. 11-00189, 2014
WL 7012391, at *4 (C.D. Cal. Nov. 12, 2014); *Wolf v. Capstone Photography,*
*Inc.*, No. 2:13-CV-09573, 2014 U.S. Dist. LEXIS 156527, at *12-15 (C.D. Cal.
Oct. 28, 2014) (collecting and analyzing cases).  The following analysis will
demonstrate that Defendants do not come close to meeting this burden.  They have

_____

§ 101 jurisprudence").

not shown that they are entitled to a free pass under § 101 to simply walk away
from this litigation.

## A. Defendants' Motion Requires Claim Interpretation

This is a motion to dismiss.  There has been no discovery, no expert
submissions, and no judicial interpretation of what the claims at issue actually
mean.  Defendants essentially "blow off" this concern in one short paragraph and a
footnote and urge the Court to forge on regardless.  DBR at 11, 11 n.29.

At the end of their long footnote, Defendants cite and seek to distinguish the
recent decision in *Data Distribution*, by the Chief Judge of this District, which
applied the presumption of validity in denying a motion to dismiss made under
§ 101, as premature prior to claim construction.  *Data Distribution*, 2014 WL
4162765.  In that decision, Judge Simandle stated, after citing the statutory
presumption, that "[i]f the Court is going to invalidate the [patent at issue] on
subject matter eligibility grounds before claim construction, then Defendants must
'establish that the only plausible construction [i]s one that, by clear and convincing
evidence render[s] the subject matter ineligible (with no factual inquiries) . . . '"
*Id.* at *6 (quoting *Clear with Computers, LLC v. Dick's Sporting Goods, Inc.*, No.
12-674, 2014 WL 923280, at *3 (E.D. Tex. Jan. 21, 2014)).

Defendants claim to distinguish Judge Simandle's decision on the basis of
their contention – guaranteed never to be seen again in any later phase of this case
– that no claim construction is necessary.  DBR at 11-12 n.29.

But Defendants' brief falls short because it is not sufficient merely to
contend that no construction is necessary.  As Judge Simandle pointed out, "the

burden that Defendants bear at this procedural posture" is to establish "that no plausible construction exists" by which "Plaintiff's claims would satisfy the abstractness test." *Data Distribution*, 2014 WL 4162765, at *8. Defendants do not even attempt to carry this burden. The only interpretation Defendants address is their own, leaving the Court in the situation in which it could only "presume, *sua sponte*," the relevant constructions. *Id*.

As will be evident from the discussion below, the parties disagree on key areas of interpretation, including the fundamental question of what WAG's patents are about. As the plaintiff argued in *Data Distribution*, the Court here "must construe many terms . . . to understand the basic character of [the patents] before assessing subject matter eligibility." *Id*. at *7. Considerations such as these caused Judge Simandle to deny the motion to dismiss in *Data Distribution*. This Court should do the same, and decline to venture into the vast territory of § 101 without an adequate record.

## B. The Supreme Court has Held that "Dissection" is an Improper § 101 Analysis

*Mayo* and *Alice* prescribe a two-step analysis under § 101. "Step one" of this analysis is to characterize the claim to determine if it is based on an abstract idea. "Step two" is to "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1298, 1297).

The Supreme Court's decision in *Diamond v. Diehr* further teaches that:

> In determining the eligibility of respondents' claimed process for patent protection under § 101, their claims must be considered as a whole. It is inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the analysis.

450 U.S. at 188.  The Supreme Court's recent decision in *Alice* reaffirmed this important aspect of the § 101 analysis:

> Because the approach we made explicit in *Mayo* considers all claim elements, both individually and in combination, it is consistent with the general rule that patent claims "must be considered as a whole."

134 S. Ct. at 2355 n.3.

The Supreme Court has repeatedly warned against such dissection, as it would "make all inventions unpatentable because all inventions can be reduced to underlying principles of nature which, once known, make their implementation obvious."  *Diehr*, 450 U.S. at 189 n.12; *Mayo*, 132 S. Ct. at 1304.

Defendants shortcut a proper § 101 analysis and engage in exactly the "dissection" that the Supreme Court has said not to do.  First, Defendants take away everything that they label as "prior art," to arrive at an alleged "point of novelty" and they brand that as a mere abstract idea.  Then they turn one-by-one to the elements they have already discarded, and unremarkably find only "prior art," concluding that they add nothing and that there is therefore no patentable subject matter.

This analysis represents an improper methodology for characterizing a claim for purposes of § 101.

The only explanation Defendants provide for how they arrive at this formulation is that they somehow reached it "after factoring out the admitted prior

art."  DBR at 12, 17.  There is no Supreme Court or Federal Circuit directive to engage in this type of "factoring out" analysis.  Rather, the Defendants cite to a district court decision as support for their "factoring."  *McRO, Inc. v. Codemasters USA Grp., Inc.*, No. CV 14-389-GW(FFMx), 2014 U.S. Dist. LEXIS 136361 (C.D. Cal. Sept. 22, 2014).  But Defendants ignore the clear stipulation in the *McRO* decision itself that claim elements must be considered "both individually and '***as an ordered combination***.'"  *McRO*, 2014 U.S. Dist. LEXIS 136361, at *10 (quoting *Alice*, 134 S. Ct. at 2355) (emphasis added).

The *McRO* case applied the "ordered combination" requirement that it recognized was required under Supreme Court precedents; Defendants would shortcut it.[8]

Defendants' entire discussion of § 101 completely overlooks the requirement to assess the claims as an "ordered combination," not once mentioning the word "combination," let alone "ordered combination."  Defendants' analysis never considers ***any*** combinations of discrete elements; they consider the elements only individually.  They chop first and analyze later, after the pieces have been

---

[8] Defendants rely extensively on *McRO*, and indeed appear to have used that case as a template for their own argument.  The *McRO* decision has been strongly criticized (see the *Cal. Tech.* decision, discussed *infra*).  Furthermore, the *McRO* patents differ from the WAG patents, in that they covered claims applying "rules" to automate a process, but as the court noted, "the claims do not require any particular rules" (*McRO*, 2014 U.S. Dist. LEXIS 136361, at *29) — which would make anyone applying their own rules an infringer.  By contrast, WAG's patents are limited to two specific types of solutions for reliable streaming media transport and leave others open.

separated from each other.  Further, the "abstract idea" that the Defendants arrive

at in this manner is wrong – not representative of what WAG's patents actually do,

not capable of achieving the objective of the patents, and completely unworkable.

## C. Defendants' Purported "Abstract Idea" of Sending Data Faster than the Playback Rate is Fundamentally Wrong and Results From an Improper Analysis

Clearly, "[t]he characterization of the claim is essential to the § 101

inquiry." *Cal. Inst. of Tech. v. Hughes Commc'ns., Inc.*, No. 2:13-cv-07245-MRP-

JEM, 2014 WL 5661290, at *13 (C.D. Cal., Nov. 2, 2014) (hereinafter, *Cal.*

*Tech.*); *Enfish, LLC v. Microsoft Corp.*, No. 2:12-cv-07360-MRP-MRW, 2014 WL

5661456, at *4 (C.D. Cal. Nov. 3, 2014) (same).[9]

Defendants Brief characterizes WAGs patent claims thusly:

Specifically, the WAG patents are directed to the abstract idea of transmitting video and audio information from a server to a media player over the Internet, which has a transmission rate faster than the playing rate of the media.

DBR at 8-9.  Defendants' Brief later reduces this even further to the following:

WAG patents are directed to the abstract idea of transmitting media data from a server to a media player over the Internet at a rate greater than the rate played on the media player.

---

[9] *Cal. Tech.* and *Enfish* were decided by the same judge on the same day.  *Cal. Tech* upholds the patents being challenged, whereas the *Enfish* case finds the patents in that case invalid.  The principles on which both decisions were based were the same, but are powerful enough to provide a tool for distinguishing between good and bad computer-related patents.  As explained herein, application of those principles clearly points to the patent-eligibility of WAG's patents.

DBR at 12.  As discussed above, Defendants purport to have arrived at this formulation by a process of "factoring out."

The Supreme Court, however, has stated that the correct approach to beginning the § 101 analysis is to determine the function performed by the "structure or process" described in the claim, "considered as a whole."  *Diehr*, 450 U.S. at 192.  As noted above, the "considered as a whole" requirement has been consistently applied by the Supreme Court ever since *Diehr*, and is an essential part of this analysis.  *See Bilski v. Kappos*, 561 U.S. 593, 611 (2010); *Alice*, 134 S. Ct. at 2355 n.3 (citing "general rule that patent claims 'must be considered as a whole.'"); *Mayo*, 132 S. Ct. at 1304 ("patent claims must be considered as a whole").

The recent Federal Circuit decision, *DDR Holdings v. Hotels.com*, concerns patents on a computer system for an outsourcer, adapted to generate composite web pages combining the visuals of a selected merchant and the electronic "commerce objects" selected by users.  The Federal Circuit noted that in some cases, "identifying the precise nature of [an abstract idea underlying a patent] is not as straightforward as in *Alice* or some of our other recent abstract idea cases." *DDR Holdings, LLC v. Hotels.com, L.P.*, No. 2013-1505, slip op. at 19 (Fed. Cir. Dec. 5, 2014).  The court addressed and discarded various formulations that sought to reduce the patents to a "business practice known from the pre-Internet world" and then simply "perform it on the Internet."  *Id.* at 20-21.

Instead, to arrive at a proper formulation, the court turned to identifying the "problem" or "challenge" addressed by the patent claims:

> In particular, the '399 patent's claims address the problem of retaining website visitors that, if adhering to the routine, conventional functioning of Internet hyperlink protocol, would be instantly transported away from a host's website after "clicking" on an advertisement and activating a hyperlink. . . .
>
> It is this challenge of retaining control over the attention of the customer in the context of the Internet that the '399 patent's claims address.

*Id.* at 20, 22.  The court then noted that the patent solved this problem by providing an "outsource provider" with a web server "which directs the visitor to an automatically-generated hybrid web page that combines visual 'look and feel' elements from the host website and product information from the third-party merchant's website related to the clicked advertisement." *Id.* at 20-21.  The court noted that the more simplified "abstract idea" formulations provided by the defendant, for example, that of merely providing a "store within a store," failed to "account for the ephemeral nature of an Internet 'location' or the near-instantaneous transport between these locations made possible by standard Internet communication protocols, which introduces a problem that does not arise in the 'brick and mortar' context." *Id.* at 21.  The oversimplified formulations that the court rejected failed to address how the patent met the "challenge of retaining control over the attention of the customer in the context of the Internet that the '399 patent's claims address." *Id.* at 22.

Similarly, the *Cal. Tech.* court, citing *Diehr*, likewise ruled that determining the purpose of the claim, based on the problem that the inventor was seeking to solve, was the proper approach to the first step under *Alice* and *Mayo*. *See Cal. Tech.*, 2014 WL 5661290, at *13.  The court viewed this as requiring an

examination of the claims *as a whole* (*see Diehr*, 450 U.S. at 188; *Mayo*, 132 S. Ct. at 1304), and *not* only as reduced to individual elements after a process of dissection.  *Cal. Tech.*, 2014 WL 5661290, at *13.  After exhaustively reviewing the Supreme Court and Federal Circuit authorities, the *Cal. Tech.* court stated:

> Courts should *recite a claim's purpose* at a reasonably high level of generality. Step one is a sort of 'quick look' test, the object of which is to identify a risk of preemption and ineligibility. If a claim's purpose is abstract, the court looks with more care at specific claim elements at step two.

*Id*. (emphasis added).

Defendants completely fail to address what WAG's claims actually do.  As in the case of the defendants in *DDR* and *Cal. Tech.*, Defendants' abstract idea formulation here abstracts away *what* WAG's patents do and *how* they solve the challenge presented.   Instead, Defendants jump right in and start removing elements, looking for "novelty" in some remaining isolated element.  They claim to have thus arrived at the "point of novelty" of these patents (DBR at 17) but they have not done so.  They have arrived only at the disembodied prescription merely to send data faster than it is played back, which as discussed below does not in itself accurately represent WAG's patents or work as a solution to the stated problem.

Defendants' formulation, that the "abstract idea" represented by WAG's patents is merely the idea of sending data from a server to a player at a rate faster than the playback rate, fails to address the combination of features needed to make WAG's claims actually work.  Key to the invention is providing a mechanism for

*regulating* the flow of media, not merely accelerating it, as under the Defendants'
formulation.

One does not have to be a network engineer to realize that doing what the
Defendants prescribe – sending data faster than it can be played back – will result
in short order in overwhelming the media player at the receiving end with a mass
of unplayed data, quickly overrunning the space that the player has allocated for
storage – a condition commonly known as "buffer overflow." In short,
Defendants' purported "abstract idea" does not fit the invention, and does not
work.

In order for WAG's inventions to be workable, considerably more is
required than merely to send out data faster than the playback rate. In the context
of WAG's '611 and '839 patents, this includes, *inter alia*, providing a first buffer
(server buffer) filled at a constant fill rate equal to the playback rate, transferring
its contents at faster than the playback rate, and then backing off to the playback
rate when a second buffer (at the user's player) has been filled. These patents also
have additional claims for recovering from an interruption in mid-stream, and for
adapting these mechanisms to serve multiple simultaneous users from a single
server buffer. In the case of the '141 and '011 patents, which provide a different
("Pull") regulating mechanism, this includes breaking up the stream into serially
identified elements, where each of the elements can be individually sent more
rapidly than the playback rate, but the flow is regulated because the individual
elements are only sent when requested by their serial identifiers.

What Defendants have done here is what the court strongly criticized in the recent case of *Ameranth*, *i.e.*, formulating an "abstract concept" of sweeping generality in order to make a § 101 argument and overlooking additional key elements in the claims that were unrelated to the purported abstract idea:

> [I]t is hard to say that claim 1 is directed to "the abstract concept of a customer loyalty program, and more specifically to computer automation of a player rewards system within a poker room" ***when it includes key steps that are not related to the compensation system recited in the claim***.

*Ameranth*, 2014 WL 7012391, at *5 (emphasis added). For the same reason, it can hardly be said that WAG's claims simply reduce to the abstract idea of sending data faster than the playback rate. That formulation does not work and overlooks elements necessary to make the system work.

Defendants' approach improperly disregards the requirement to examine the claims as an "ordered combination." The "factoring out" methodology that Defendants employ for purporting to get to the "point of novelty" is improper for a § 101 analysis, and contrary to controlling Supreme Court and Federal Circuit precedent. [10]

---

[10] Defendants' "factoring out" approach is similar to the "abstraction-filtration-comparison" ("AFC") test sometimes used for copyright infringement. *See Computer Assoc., Inc. v. Altai, Inc.*, 982 F.2d 693, 706-11 (2d Cir. 1992). This test is unsuitable for patent law because of the difference in the respective statutory "subject matter" provisions. Copyright expressly ***excludes*** coverage for any "process, system, method of operation" (17 U.S.C. § 102(b)), and the AFC test is designed to filter such elements out. Patent law, on the other hand, expressly ***includes*** such subject matter under 35 U.S.C. § 101.

In addition to constituting improper dissection, Defendants' approach improperly focuses on novelty, which is not relevant to determining patent-eligibility, [11] and conflates step one and step two of Mayo.[12]

Defendants' approach, by "factoring out" prior art first, (i) is ***backwards*** from the approach prescribed in *Alice*, which would only analyze additional elements as a ***second*** step, after any "abstract idea" had been identified, (ii) ***over-filters***, because mere "conventional activity" as that term is used in *Mayo* and *Alice*, is a narrower category than the entire body of the world's "prior art"[13] — a conventional element may be defined as one that is "ubiquitous in the field, insignificant or obvious"[14]; and (iii) fails to consider combinations in its filtration.[15]

---

[11] *Cal. Tech.*, 2014 WL 5661290, at *11 ("the Supreme Court has held that novelty "is of no relevance" when determining patentability") (quoting *Diehr*, 450 U.S. at 189).

[12] *Id.* (emphasis in original):

[Such an approach] conflates step one and step two of *Mayo*.  At *Mayo*'s second step, the court must determine whether there is something more than an abstract idea, and conventional elements do not constitute something more. From this principle, [Defendants would] filter out elements found in prior art ***before*** performing step one. This appears to be incorrect, because according to *Alice*, courts should not even consider whether elements are conventional unless the court determines that the invention is abstract at step one. Courts must filter out elements only at step two.  [This approach] therefore conflates Mayo's two steps in the face of binding precedent rejecting that approach.

[13] "[N]either *Mayo* nor any other precedent defines conventional elements to include ***everything*** found in prior art." *Id.* at *11 (emphasis in original).  "[A] claim element is not conventional just because it appears in prior art." *Id*. at *3.

[14] *Id.* at *14 (citing *Mayo* and *Diehr*).

[15] "[C]ourts should remember that a series of conventional elements may together

In short, Defendants' "factoring out" and (alleged) "point of novelty" approach, like those criticized in *DDR*, *Cal. Tech.*, and *Ameranth*, is designed to abstract away both the "what" and the "how" of the inventions at the first stage of the analysis, which thereby preordains Defendants' desired conclusion and guarantees a negative determination.

Like the "store within a store" formulation in *DDR*, and the "consumer loyalty program" abstraction alleged in *Ameranth*, Defendants' "faster than the playback rate" formulation fails to address the issues of the domain in which the invention must operate. As in *Cal. Tech.*, where the defendant's formulation of the invention as a mere "mathematical algorithm" would overlook the "unconventional steps" recited in the algorithm "for achieving error correction," Defendants' formulation here would have the Court overlook inventive technological mechanism by which WAG solved the network data transport problem it had identified.

As addressed below, the proper approach is to look directly at the ***problem*** that the inventor was seeking to solve with the invention, and thereby identify the ***purpose*** of what the inventor devised. *See Cal. Tech.*, 2014 WL 5661290, at *13 ("correct approach [is] asking what the claim was trying to achieve"). Properly characterizing what an invention is really about, by considering the claims "as a whole" (*Diehr*; *Bilski*; *Mayo*; *Alice*), is the proper first step in a § 101 analysis.

---

form an unconventional, patentable combination." *Id.* at *3.

**D. The Purpose of WAG's Patents Is to Provide Reliable Mechanisms to Transmit a Continuous Stream of Media Data Over an Inherently Faulty Medium**

WAG's patents themselves address their purpose.  The written descriptions in these patents describe the two primary factors that tend to cause degradations and interruptions of streaming media: the variable quality of a user's connection and momentary congestion that occurs on the Internet.  *See, e.g.*, '141 patent, col. 2, line 10, *et seq.*  In other words, the communications medium itself is inherently faulty.

The patents then recite the problem sought to be addressed, *i.e.*, the need for solutions "which facilitate[] continuous transmission of streaming content, respond on demand without objectionable buffering delay, and perform without disruption or dropouts."  *See, e.g.*, '611 patent, col. 3.

In other words, WAG's patents address the problem of providing for reliable and timely delivery of streaming media programming over a faulty medium that does not guarantee timely delivery.

The patents then go on to describe about half a dozen alternative embodiments for overcoming the stated problem of having to communicate time-sensitive data (a streaming media program) over a faulty medium (the Internet).  *See, e.g.*, '141 patent, cols. 5-13.

Note that the problem identified is more than merely the problem of "reliable" data transport.  That is because the data here has additional characteristics, in addition to those of random "data" of any arbitrary type.  Specifically, streaming media is (a) sequential ("ordered") and (b) consumed at or

near "real time," requiring "timely" delivery of the constituent elements in order for the user to experience a continuous display of the program at its natural speed. Thus, in addition to merely transporting data, both the **order** and the **timing** of the media stream must also be preserved in order to provide a proper playback.[16]

It is therefore evident that Defendants' characterization of WAG's patent claims is incorrect. The purpose of the claims is not to send data faster than the playback rate, but to regulate flow so that the player has a continuous supply of data at the playback rate, and to do this in the face of a network infrastructure between the server and the player that does not guarantee such delivery. No one would set out simply to send data faster than the playback rate. It is only a part of Plaintiff's solution, not its overall purpose.

## E. WAG's Patents Claim Specific Implementations and Do Not Purport to Cover All Systems For Providing Reliable and Timely Streaming Media Transport

While WAG's patents identify the problem of trying to send streaming media, which demands both reliable and timely delivery over a faulty medium that does not guarantee such delivery, the patent claims are not drafted in a manner that purports to cover, or even as a practical matter would cover, any and all mechanisms for solving this problem.

---

[16] Defendants seek to confuse the issue by raising the "TCP Protocol" (Transmission Control Protocol). DBR at 16-17. The Internet's TCP protocol addresses the problem of "ordered" transport, but not that of "timely" transport. **Both** solutions are necessary for media streaming and TCP in itself is not sufficient.

At the next lower level, WAG's patents seek to meet the objective of delivering a continuous stream of media data in a reliable and timely manner over a faulty medium by providing a mechanism to regulate data flow.  But again, the claims are not drafted to cover any and all systems merely because they regulate data flow in some manner to provide for reliable transport.

Rather, WAG's patents claim specific and different particular ways of regulating data flow to achieve the stated objective.

One solution provided is referred to as "buffering" and more particularly involves a "double" buffer – a buffer at ***each end*** of the communication.  *See, e.g.*, claims 1 and 2 of the '839 patent.[17]  In addition to the player buffer, these claims involve a server-side buffer.  Such a buffer normally passes data through at the playback rate, but content can be held in it, and sent, ***when needed to keep the player buffer full***, at a rate faster than the playback rate.  The system can detect conditions indicative of an interruption in transmission.  Data accumulated in the server buffer is transferred at full speed when the player buffer needs topping up, such as when first starting or when recovering from an interruption.  Thus, a facility is provided using a server-side buffer in conjunction with a player buffer, providing the capability of sending faster than the playback rate when needed to regulate the flow which otherwise takes place at the playback rate, so as to

---

[17] This case has not reached the stage procedurally where WAG has had to submit infringement contentions identifying all claims alleged to be infringed.  WAG cites claims 1 and 2 of the '839 patent, and the other claims specifically discussed herein, merely as examples for illustration.

maintain the player buffer at a level that protects it from starving for data (or overflowing).

Claim 5 of the '839 patent takes the implementation further and adds multi-user capability.  It does not just say to do the same thing for multiple users, it provides a method of adapting the single-user solution to serve multiple users from the same single server buffer using a system of "pointers."

A second solution, as reflected, for example, in claims 10 or 19 of the '141 patent, is a "pull" solution.  This involves dividing the entire stream as it arrives from some source into a sequence of serially identified elements.  Each element has the ***capability*** of being transmitted faster than the playback rate – ***when needed to keep the player buffer full***.  However, instead of trying to detect interruptions to determine when the player buffer needs topping up, the server waits for the player to request an element, by its ID, thereby letting the player make the determination of what and when to send to ensure uninterrupted delivery.

Thus, WAG's patent claims provide two entirely distinct and specific mechanisms to regulate data flow and thereby provide for reliable streaming data transport.  In the "Buffering" implementation, the server relies for its flow regulation on a mechanism providing for an initial buffering on the server side and to sense interruptions in transmission.  It then further generalizes this approach to support multiple simultaneous users.  In the "Pull" implementation, the server responds when it receives a player request, and regulates the flow in that manner. Nowhere do these claims purport to cover all systems for providing reliable and

timely streaming media transport (nor for that matter do they purport to claim all methods involving the element of sending data faster than the playback rate).

In viewing the claims as a whole, it is apparent that both sets of claims provide inventive feedback-regulating mechanisms to control end-to-end data flow in a system operating over the Internet.  This not the general idea of providing reliable and timely communications transport, or even the general idea of using a regulating mechanism, but rather specific implementations, where the implementations themselves are based on a nonconventional arrangement of components or steps.  It is also clear that sending data faster than the playback rate is but one ingredient in the solution, which must be controlled and regulated by mechanisms such as those devised by WAG in order to be useful.

## F.  WAG's Patent Claims Do Not Preempt the Field

The Supreme Court has emphasized that the policy underlying its doctrines on § 101 is based on a concern over "preemption."  The preemption concern is that allowing legal protection to extend too far beyond specific developments, so as to broadly freeze an entire area of human endeavor under the control of patents, will serve to impede innovation in the area rather than incentivize it.  Patents should therefore not "foreclose[] more future invention than the underlying discovery could reasonably justify."  *Mayo*, 132 S. Ct. at 1301.

But there is a line between giving an entire industry at large "freedom to operate" or "freedom to innovate," and giving particular industry participants a "license to steal" – *i.e.*, a free pass to use others' technology without compensation.

Defendants repeat the incantation of "preemption" half a dozen times in their brief.  But Defendants never explain how WAG's patents prevent them from either innovating or operating.

Defendants make the bald statement that: "WAG patents would prevent the use of additional ways to transmit data over the Internet from a server to a user given then (and now) that the Internet speed is faster than a media player's playback rate."  DBR at 18.  Defendants do not quote any claims here and no doubt assumed incorrectly that the Court would never read them.  Clearly, there is no claim in these patents to simply "transmit[ting] data over the Internet from a server to a user . . . faster that the media player's playback rate."  Each and every claim requires much more to be done in combination with occasional delivery faster than the playback rate, in order to operate.  Defendants' contention is an imaginary straw man; it is way off base factually and the Court would be seriously misled to accept any argument based on this contention.

The *McRO* case, relied on so heavily by Defendants (though they shortcut its analysis by failing to consider combinations of elements) is distinguishable from this case on pre-emption grounds.  In *McRO*, the court found that the subject patents, which claimed a rules-based approach to lip synchronization but never specified what the rules were, preempted the field of "lip synchronization using a rules-based morph target approach" — *i.e.*, nobody else could use the principle that the plaintiff discovered for improving lip synchronization, anywhere in the field. *McRO*, 2014 U.S. Dist. LEXIS 136361, at *32.

WAG's patents do not preempt any field, or the use of any principle in any field.  As noted, the patents-in-suit themselves provide two operationally distinct types of mechanisms for solving the specified Internet delivery problem.  The fact that there are two solutions separately at issue here in itself indicates that no one solution has preemptive force.

Defendants' brief fails to even acknowledge that WAG's patents provide two types of solutions in separate claims (the fact that they combine these into one alleged "abstract idea" highlights the problem with their analysis).  Moreover, even if Defendants were to argue that WAG's patents *in combination* preempt the field (a novel suggestion in itself), this proposition would fail as well.  In addition to the two solutions provided by the patents-in-suit, there are other solutions that are extremely widely used in this field.

As stated in *McRO*, "[i]t is hard to show that an abstract idea has been preempted if there are noninfringing ways to use it in the same field."  *Id.* at *23.

Such examples of alternate approaches definitely exist.  These alternatives include, but are by no means limited to: (i) "Progressive Download" (transmission of entire file with "metadata" up front); (ii) "IP Multicast" (one-to-many packet routing via network infrastructure); (iii) "Application-Level Multicast" (implemented at application layer rather than in network infrastructure, *e.g.*, some implementations of Skype®); and (iv) "Unicast" switching to "Multicast" after stream startup.

WAG will maintain in this case that its streaming solutions are by far the best of the currently available alternatives for the types of streaming distribution

practiced by the Defendants.  But providing the best of a number of alternative solutions is good competition, not "preemption" of an entire area of endeavor of the types disfavored by the Supreme Court's § 101 jurisprudence.  In any case, there is plenty of room for continued development in the streaming field, notwithstanding WAG's patents.  "[P]atent law does not privilege the leisure of an infringer over the labors of an inventor."  *Eclipse IP LLC v. McKinley Equip. Corp.*, No. SACV 14–742–GW(AJWx), 2014 WL 4407592, at *5 (C.D. Cal. Sept. 4, 2014).  "It may often be easier for an infringer to argue that a patent fails § 101 than to figure out a different way to implement an idea, especially a way that is 'less complicated—less liable to get out of order—less expensive in construction, and in its operation.'"  *Id.* (quoting *O'Reilly v. Morse*, 56 U.S. 62, 113 (1854)).

Defendants decry what they falsely label as WAG's "preemption."  The Defendants here do not seek freedom to innovate, because they already have that freedom if they wanted to use it; rather, they simply do not want to be inconvenienced by having to pay for their use of another's property.

Clearly, given all of the alternatives, including those provided by in WAG's patents, as well as those that exist outside WAG's patents, there is no basis for the Court to conclude that WAG's patents preempt the field.

## G. Technological Subject Matter Such as That Claimed in WAG's Patents Has Generally Been Found Patent Eligible.

The Supreme Court's *Alice* decision made some important distinctions based on the nature of the subject matter in dispute, *e.g.*:

> the claims in *Diehr* were patent eligible because they improved an existing technological process

*Alice*, 134 S. Ct. at 2358.  *Alice* also suggested computer-related subject matter that might pass muster:

> The method claims do not, for example, purport to improve the functioning of the computer itself . . . Nor do they effect an improvement in any other technology or technical field.

*Id.* at 2359.

It is very clear that WAG's patent claims effect "an improvement in … other technology" — and existing technological process, *i.e.*, delivery of streaming media.  The above quotes from *Alice* strongly suggest that the presence of such technological subject matter is at least a strong clue to patentability.

To the same point is the recent Federal Circuit decision in *DD*R, *supra*.  The court there, finding patentable subject matter under § 101, stated:

> these claims stand apart because they do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet.  Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks.

*DDR Holdings*, slip op. at 20.

The court's characterization of the claims at issue in *DDR* fit the claims in the case at bar at least equally as well.  The claimed solution here is indeed rooted in "computer technology" — buffers, files, requests, responses, transport mechanisms, real-time communications, and so forth, "in order to overcome a problem specifically arising in the field of computer networks."  In fact, it fits to a tee.  *See also OpenTV, Inc. v. Netflix Inc.*, No. 14-cv-01525-RS, Order at 7 (N.D. Cal. Dec. 16, 2014) (applying DDR to uphold patent under § 101; "[a]t least at this

juncture, the patent appears to be directed at providing a technological solution to a problem that arises in the computer/interactive television context.").[18]

## H. Defendants' Arguments, If Accepted, Would Have the Effect of Making All Computer-Related Inventions Unpatentable, Beyond Anything the Supreme Court has Held and Contrary to the Intentions of Congress.

The Supreme Court cautioned in *Alice* that the courts must "tread carefully in construing this exclusionary principle [for abstract ideas] lest it swallow all of patent law." *Alice*, 134 S. Ct. at 2354 (citing *Mayo*, 132 S. Ct. at 1293-94). The type of mechanistic "dissection" advocated here by Defendants naturally leads to this slippery slope. Defendants' dissection process would inevitably invalidate every conceivable computer- and software-related patent that ever was or will ever be. Modern computer- and software-related inventions are typified by the characteristic that they build incrementally on the prior art, making them all particularly vulnerable to the type of argument advanced here by Defendants. Invalidating all such patents would go far beyond the holding of any of the *Bilski-Mayo-Alice* trilogy, which declined to say that computer- and software-related and even business method subject matter was all unpatentable. *See, e.g.*, *Alice*, 134 S. Ct. at 2351 (suggesting that methods might be patentable that "improve the functioning of the computer itself or effect an improvement in any other technology or technical field"); *Bilski*, 561 U.S. at 606-07 ("the Court [is not]

---

[18] The OpenTV decision finds one patent valid under § 101 and two invalid, thereby also serving as a good reference point on the dividing line between what passes muster under § 101 and what does not. WAG's patents are well to the good side of the analysis set forth in *OpenTV*.

holding that … technologies from the Information Age should or should not receive patent protection" and the terms of § 101 "do not categorically exclude[] business methods.").  Such a result would also disregard recent legislation which explicitly recognizes and acquiesces in the judicial acceptance of computer- and software-related patents.  *See* The America Invents Act ("AIA"), Pub. L. 112-29, § 14, Sept. 16, 2011, 125 Stat. 284, 327 (excluding broad categories of "computer program products" or "systems" from defenses to patentability established with respect to "tax strategies.").  An approach such as that pursued by the Defendants would expose all computer- and software-related inventions to invalidation, contrary to the intentions of the Supreme Court and Congress.

The court in *Cal. Tech.* summarized this concern aptly:

> [I]t is difficult to imagine any software patent that survives under [Defendants'] approach—most inventions today build on what is known in the art, and an improvement to software will almost inevitably be an algorithm or concept which, when viewed in isolation, will seem abstract. This analysis would likely render all software patents ineligible, contrary to Congress's wishes.

2014 WL 5661290, at *11.

Extending *Mayo* and *Alice* in the manner proposed by Defendants would thus effectively adopt a threshold for patentability that no modern computer- or software-related invention could ever meet.  It would be error to go down this path and Plaintiff urges the Court not to take Defendants' invitation, however simple it may seem to do so from the present vantage point of a case in the early stages of litigation.

## POINT IV.   PLAINTIFF ADEQUATELY PLEADS DIRECT INFRINGEMENT

### A. Distinctions Among Direct, Induced, and Contributory Forms of Infringement

There are various ways in which one or more parties can become liable for patent infringement.

One person can of course personally commit all of the acts sufficient to constitute infringement.

In addition, someone who ***exercises direction and control*** in a matter that causes the acts of infringement by the hands of another is just as liable for infringement as the one whose hands perform the infringing acts.

Similarly, someone who ***induces*** infringement is just as liable for infringement as the one who actually commits the underlying acts of direct infringement.

Defendants' Brief addresses these infringement concepts in a confusing manner.  The following simple principles are all that is necessary to address the infringement issues relevant to this motion:

**Basic types of patent infringement liability:**

- "Direct" Infringement – 35 U.S.C. § 271(a) – the defendant is responsible for acts sufficient to constitute infringement.  "Responsibility" can exist because the defendant physically performs the sufficient acts, or exercises direction and control causing those sufficient acts to be performed.  Direction and control can be physical direction and control, or legal direction and control, such as by agency or contract.

- "Indirect" Infringement – 35 USC § 271(b) and c)) – a general reference to two additional statutory types of infringement – "inducing" infringement and "contributory" infringement.

- ○ "Induced" Infringement – 35 U.S.C. § 271(b) – Where one actor becomes liable by reason of "actively inducing" another to commit acts sufficient to constitute infringement (e.g., encouraging the infringement in a manner that is active, but may be short of "controlling").

- ○ "Contributory" infringement (35 U.S.C. § 271(c) – Where one actor provides a nonstaple component or element to another, thereby completing all that the other needs to then go on and infringe

**Important characteristics of these types of infringement:**

- ● Scienter

  - ○ Direct infringement – None.  Direct infringement is a matter of strict liability.  The defendant need not know of the patent or know that the acts it commits (or causes, directs, or controls) are infringing, in order to be liable.  *In re Seagate Tech., LLC*, 497 F.3d 1360, 1368 (Fed. Cir. 2007) (*en banc*).

  - ○ Indirect infringement (of either type) requires

    - ■ knowledge (at the time) of the patent (*DSU Medical Corp. v. JMS Co., Ltd.,* 471 F.3d 1293 (Fed. Cir. 2006), and

    - ■ knowledge (at the time) that the induced conduct would infringe the patent.  *Global-Tech Appliances, Inc. v. SEB SA*, 131 S. Ct. 2060, 2068 (2011).

  - ○ Contributory infringement has a similar requirement, that the person violating know that the supplied element is "especially made or especially adapted for use in an infringement" of the patent.  35 U.S.C. § 271(c).

  - ○ The knowledge element can be satisfied by proof that the inducer was "willfully blind" to the risk of infringement.  *Global Tech*, 131 S. Ct. at 2068-69.

- ● Relation of Indirect and Direct infringements

  - ○ Indirect infringement (of both types) requires that there be an underlying act of direct infringement.  *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341-42 (1961).

○ For direct infringement to lie, acts sufficient to constitute infringement must be attributable to a single actor (though this can include a chain of physical or legal direction and control leading up to a single controlling actor).[19]

Note, however, that while indirect infringement requires an underlying direct infringement, and direct infringement must be attributable to a single actor, it is ***not*** true that two or more actors cannot be involved in direct infringement. Such liability can exist, provided that responsibility for acts sufficient to constitute infringement can ultimately be attributed to one or more of the actors individually.

## B. Plaintiff's Allegations of Direct Infringement are Legally Sufficient

All that is required to adequately plead a claim for direct patent infringement is to set out allegations conforming to the format of Form 18 in the Appendix to the Federal Rules of Civil Procedure. *In re Bill of Lading Transmission*, 681 F.3d 1323, 1334 (Fed. Cir. 2012). *See* Rule 84, Fed. R. Civ. P. ("[t]he forms in the Appendix suffice under these rules and illustrate the simplicity and brevity that these rules contemplate"). Form 18 is approximately a page of text in which plaintiff inserts a statement of jurisdiction and fills in the date of issue and number of its patent and the name of the accused product(s), which are simply listed as

---

[19] Contrary to Defendants' Brief (DBR at 23-24), *Limelight* has no holding whatsoever on this point, having expressly reserved any ruling on the question. *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S.Ct. 2111, 2120 (2014). *Muniauction* does address this issue under § 271(a), thought the Supreme Court has implicitly questioned whether the *Muniauction* decision is unduly limiting. *Id.* at 2119 (noting the "possibility that the Federal Circuit erred by too narrowly circumscribing the scope of § 271(a)."). WAG's allegations herein have been framed so as not to require the Court to reach the latter issue, *i.e.*, WAG has not relied on any extension or modification of *Muniauction*.

"electric motors" in the example form.  *See* Fed. R. Civ. P., Form 18.  "[P]roper use of a form contained in the Appendix of Forms effectively immunizes a claimant from attack regarding the sufficiency of the pleading."  *K-Tech*, 714 F.3d at 1283.[20]  The Federal Circuit has held that a complaint that states that an accused device "falls within the scope of one or more claims" of an identified patent is sufficient.  *McZeal v. Sprint Nextel Corp.,* 501 F. 3d 1354, 1357 (Fed. Cir. 2007).

Though WAG has gone worlds above these simple requirements, Defendants somehow argue that WAG has not met its burden, but they fail to address the simple requirements of Form 18 or the relevant Federal Circuit precedent regarding its use.

Defendants' arguments in regard to direct infringement are not only incomplete and incorrect; they jump ahead to the merits of the case, requiring claim construction and / or application of the claims to the accused systems.  This is premature for a motion to dismiss.  This case is not yet even at a point where the Local Patent Rules will require WAG to identify the specific claims it will assert.[21]

---

[20] *K-Tech* also notes that "Form 18 would control in the event of a conflict between the form and *Twombly* and *Iqbal*," but finds no such conflict because proper use of the form will satisfy the "notice" and facial "plausibility" requirements.  *K-Tech*, 714 F.3d at 1284-87.

[21] *See* L. Pat. R. 3.1 (requiring disclosure of asserted claims and infringement contentions "[n]ot later than 14 days after the initial Scheduling Conference."); *see also In re Bill of Lading Transmission*, 681 F. 3d 1323, 1335 (Fed. Cir. 2012) (for direct infringement, "a plaintiff need not even identify which claims it asserts are being infringed.").

Defendants incidentally acknowledge the existence of Form 18 (DBR at 24), but nevertheless present arguments going on for 20 pages (DBR at 25-44) against individual claims of the patents-in-suit.  This is the same approach that was disapproved by the Federal Circuit in *Bill of Lading*:

> In essence, the Appellees argue that the amended complaints are deficient because they do not describe precisely how each element of the asserted claims are practiced by their customers.  When compared to the requirements of Form 18, this argument is premised on a pleading standard that is too stringent.

681 F.3d at 1335.  Defendants here do exactly the same thing, and similarly, it provides an insufficient basis to dismiss.

Such claim-by-claim attacks are entirely misplaced in a motion to dismiss a direct infringement count.  Only one claim of a patent needs to be infringed for a finding of direct infringement.  *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 261 F.3d 1329, 1336 (Fed. Cir. 2001).  To secure dismissal of a direct infringement count as to any particular patent, Defendants therefore have to establish for ***each and every claim*** of that patent that infringement is completely implausible on any set of facts or any possible claim construction.  If they fail on one claim as to any patent, the motion to dismiss the direct infringement count as to that patent must be denied.  They come nowhere close to mounting effective arguments against ***all*** of the claims.  Moreover, and the Federal Circuit noted in *K-Tech*, 714 F.3d at 1285-87, such an attack, regardless of how many individual claims it targets, will surely fail if the complaint complies with the minimal requirements of Form 18, which these complaints do.

Defendants also seek to confuse matters with the argument that multiple

defendants (*e.g.*, Doe defendants) are named in each case with a purported lack of

specificity as to which defendants carry out which acts.   As explained under a

separate heading below, this argument is also misplaced because WAG's causes of

action are not for "joint" infringement involving multiple participants in each

infringement, but rather for several infringement by each of the Defendants.

> **1.   Defendants' Arguments Against Direct Infringement of
> Method Claims Are Premature As Requiring Claim
> Construction, and Flawed Because No Action By the User Is
> Required**

> > **(a)   Defendants' Arguments Require Claim Construction
> > and Are Therefore Premature**

Defendants argue that the method claims of the '611 and '839 patents

require action by the user and that the method claims of the '141 patent require

providing the user with a physical device.   Besides being incorrect and making

misrepresentations in both arguments, the arguments are premature as they would

require the Court to construe claims: (i) to literally require multiple actors in the

case of the '611 and '839 patents; and (ii) to rule, with respect to the '141 patent,

that the step of "providing" software on a machine-readable medium can only be

met by physically delivering the medium itself.

As Judge Debevoise has said in denying such a motion to dismiss, "the

proper time for this Court to address claim construction is not in a motion to

dismiss."  *Cima Labs., Inc. v. Actavis Group HF*, No. 07-893, 2007 WL 1672229,

at *3 (D.N.J. June 7, 2007) (quoting *Schreiber v. Eli Lilly & Co.*, No. 05CV2616,

2006 WL 782441, at *4 (E.D. Pa. Mar. 27, 2006)); *see also Fujitsu Ltd. v. Belkin*

*Intern., Inc.*, 782 F. Supp. 2d 868, 889-90 (N.D. Cal. 2011) ("[A] motion to dismiss is not the proper time to raise claim construction arguments."); *Deston Therapeutics LLC v. Trigen Labs. Inc.*, 723 F. Supp. 2d 665, 670-71 (D. Del. 2010) (declining to perform claim construction on a motion to dismiss (collecting cases), and noting that "*Markman* processes [in local patent rules] recognize that typically, as in the present case, the complaint and the patents' language are necessary but insufficient components of the record for claim construction.").

Indeed, courts have even examined the specific argument that a claim requires multiple actors, as Defendants argue with respect to the method claims of the '611 and '839 patents, and found this argument premature on a motion to dismiss. *Actus, LLC v. Bank of America Corp.*, No. 2–09–cv–102, 2010 WL 547183, at *2 (E.D. Tex. Feb. 10, 2010) (denying motion to dismiss because the "motion asks the Court to simultaneously adopt a construction that the claims can only be performed by multiple actors . . . and then impose an excessively conservative pleading requirement on those claims."); *Yangaroo Inc. v. Destiny Media Technologies Inc.*; No. 09–C–462, 2009 WL 2836643, at*4 (E.D. Wis. Aug. 31, 2009) (denying motion to dismiss based on argument that claims require actions of multiple parties because the motion "necessarily entails a construction of the claim, which is inappropriate given the infancy of these proceedings") (collecting cases).

The Court should therefore not consider Defendants' arguments on the method claims since those arguments inherently require premature claim construction.

**(b)   Even If the Court Reaches Defendants' Arguments on WAG's Method Claims, None of the Claims Require Multiple Parties or Delivery of a Physical Medium With Software**

For the method claims of the '611 and the '839 patents, Defendants base their argument on an overt misstatement of the claim language.  Each of these method claims concern steps taken to serve content.  The claims recite the presence of a "user computer," but none of the claim steps requires action by the user's computer.  The claims recite the *effect* of the claimed actions, "wherein" data or media data elements are "*received* . . . by the user computer [or system]" (emphasis added).  Defendants try to make this recitation look like a claimed step by altering the quoted language to say, "receiv*[ing]* media data elements."  DBR at 28-29 (emphasis added).  This is an outright misrepresentation of what the claim says.  With the alteration of the quoted claim text, changing "received" to "receiving," Defendants attempt to change a portion of the claim to look like a separate "step" performed by the end user.[22]  But the claims as written merely recite an effect, "wherein" the media data elements "are received . . . by the user computer."  It is telling that Defendants need to mangle a quote to even make their argument.

This type of language was addressed in the *SiRF Technology, Inc. v. International Trade Commission* case, in which the claim in question recited "communication [sic] the satellite ephemeris *to a mobile GPS receiver at a second location*" and "transmitting the formatted data *to a remote receiver*."  601 F.3d 1319, 1329-30 (Fed. Cir. 2010) (emphasis added).  The Federal Circuit found SiRF

---

[22] Steps of a method claim begin with a present participle ("-ing").

to directly infringe even though the claim expressly recited the remote GPS receiver that was at the client location. *Id.* There, as here, "the method claims at issue . . . are drawn to actions which can be performed and are performed by a single party" and "do not require that any of the steps be performed . . . by the customers or the end users." *Id.* at 1329; *see also Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1309 (Fed. Cir. 2011) ("That other parties are necessary to complete the environment in which the claimed element functions does not necessarily divide the infringement between the necessary parties.").

For the method claims of the '141 patent (which are only one subset of the claims in the patent, which also includes apparatus (system) and article claims), Defendants note that each method claim includes a step of "providing a machine-readable medium . . . on which there has been recorded software . . ." DBR at 28. Defendants fail to note that Plaintiff has alleged that some Defendants physically provide this software (via download)[23], and that all of them take steps to activate this software in the user's device.[24] Defendants argue, incorrectly and without citation, that the "providing" claim step can be met only by physically supplying the "machine-readable medium in the end user's computer." DBR at 28. At most, Defendants raise a claim construction issue as to what the word "providing" means

---

[23] *See Sobonito* Case No. 1661 Second Amended Complaint (D.I. 26) ¶¶ 69, 73, 91-94, 102, 117-120; *Vubeology* Case No. 4531, Complaint (D.I. 1) ¶¶ 43, 48, 66-68, 77, 92-94.

[24] *See, e.g.*, *Gattyán Group* Case No. 2832 First Amended Complaint (D.I. 17) ("Gattyán FAC") ¶¶ 86-89.

in the method claims of the '141 patent, which, as outlined above, is premature at the motion to dismiss stage.

### 2. Defendants' Arguments Against the System Claims are Similarly Premature and It is Clear in Any Case that Defendants "Use" their Own Systems

Defendants argue — incredibly — with respect to all of the system claims of the patents-in-suit, that Defendants do not "use" their own systems. This argument is again premature because it requires claim construction, but this defect is overshadowed by the patent absurdity of the argument.

### (a) Defendants Clearly "Use" Their Own Servers as Claimed in Three of the Patents-In-Suit

As to the system claims in the patents-in-suit, Defendants argue only that they do not "use" the claimed invention. In each of the '141, '611, and '839 patents, there are claims directed to specifically and only "servers" as well as separate claims to machine-readable media containing software for operating a server.[25] Defendants are all Internet Service Providers that clearly "use" their own servers and the operating software for those servers. Any argument to the contrary is preposterous.

Defendants argue that "use" of a "system" results from obtaining the "benefit" of the system and exercising "control" over it (and/or putting the system "into service").

---

[25] *See* '141 patent claims 10-18, 19-23; '611 patent claims 8-11, 14-18, and '839 patent claims 8-14, 15-21.

Defendants argue "benefit" for five pages (DBR 30-35), but there was never any question that users may "benefit" from accessing servers over the Internet.

Defendants, however, adopt an untenable position when they next assert, as they do on pages 35-40 of their brief, that when a user merely "selects a video stream," he or she "puts into service the Internet video streaming system."  This is questionable.  The system was already in service before the user made the request. It is the person(s) responsible for provisioning, turning on, or operating the server that "controls" it in this manner — not every user requesting content over the Internet.

But more fundamentally, what in the world says that the company operating the server is not "using" it?  It is irrelevant to the issue of infringement by the server operator whether one or more users are also "using" the server.  Defendants' argument is a complete *non sequitur*.  Under Defendants' logic, no Google, Facebook, Netflix, eBay could ever be sued for direct infringement by reason of a system claim covering one of their servers, so long as there are users that access the servers.

To press this improbable argument, Defendants attempt to marshal support from the Federal Circuit's decision in *Centillion*.  They argue that it is "typically the end user of a communication system" that uses the system.  DBR at 35-36.  But *Centillion* in no way stands for the proposition that claimed computer- or network-related systems are ***only*** "used" by an end user.

Moreover, the individual patent claims at issue in *Centillion* each covered ***both*** back-end and front-end systems.  This is a critical distinction from the claims

here, many of which, as discussed, are directed solely to servers or server software. *Centillion*, 631 F.3d 1279, 1286 (Fed. Cir. 2011).  The Federal Circuit found that Qwest, the service provider which supplied the back-end systems and software, could not "use" the system only because the system specifically claimed "personal computer data processing means" which were at the customer site and used and controlled by the customer.  *Id.*  The Federal Circuit separately examined whether the customer could "use" the system as a whole despite the fact that the claimed system also included elements that were on the server-side, finding that the customer could initiate such "use" from the front-end components, because of the nature of the claims.[26]  *Id.* at 1284-86.

There is also nothing in *Centillion* or *NTP* holding that multiple parties cannot "use" the same system.  Even assuming the end users "use" Defendants' servers merely by accessing them over the Internet (which is questionable), ***so do Defendants***.  To get anywhere with this type of argument, Defendants' must show that ***they*** do ***not*** use the claimed servers, not that just that others use them as well.

In short, there is no a blanket rule (such as Defendants make up) that only end-users "use" systems.  *See, e.g.*, *Soverain Software LLC v. J.C. Penney Corp.*, 899 F. Supp. 2d 574, 580-81 (E.D. Tex. 2012) (distinguishing *Centillion* and finding that a service provider "used" a claimed communication system).

---

[26] Defendants also cite *NTP*, which similarly involved a distributed system, with front- and back-end components in different countries, and is inapposite for the same reasons.  *See NTP v. Research in Motion, Ltd.*, 418 F.3d 1282, 1314 (Fed. Cir. 2005).

Since at least these claims must stand, the Court accordingly cannot dismiss the direct infringement counts for the '141, '611, and '839 patents.[27]

### (b) Defendants Overlook the Allegations that They Exercise Direction and Control Over Users' Players

Plaintiff alleges both direct and indirect infringement of the '011 patent. This argument under this subheading addresses Defendants' arguments concerning direct infringement of the '011 patent.

The '011 patent has four claims, all directed at players. Defendants say, in substance, that they only operate servers, and therefore ask, how can they be held liable for infringement based on the use of an article — the media player devices — that individual users bring into the equation?

First, Defendants overlook that in two of the cases, Plaintiff alleges that the Defendants actually commit acts that constitute making the players that infringe – turning the users' devices into infringing players. *Sobonito* Case No. 1661 Second Amended Complaint (D.I. 26) ¶¶ 73, 102; *Vubeology* Case No. 4531 Complaint (D.I. 1) ¶¶ 48, 77.

Furthermore, in all of these cases, Plaintiff alleges that Defendants are liable for using these players as a result of their exercise of direction and control over the players.

---

[27] As the sole exception to the foregoing, Defendants do attack direct infringement as to all claims of the '011 patent (the '011 patent has only four claims). However, as demonstrated under the following heading below, Defendants' motion must also be denied as to direct infringement of the '011 patent.

Defendants' reliance on "vicarious liability" cases requiring agency or contractual obligations over people is completely misplaced.  Plaintiff in this instance is alleging direction and control over devices.

Plaintiff here is alleging, as against each and every Defendant, considerably more than mere vicarious liability.  Plaintiff has alleged in these complaints that Defendants' servers exercise actual *physical* direction and control over users' players.  Defendants' servers send electronic instructions that direct and control infringing operations to inexorably take place on the player after the instructions are received.  *See SiRF*, 601 F.3d at 1330-31 ("SiRF infringes as its devices and software dictate the performance of the 'processing' and 'representing' steps [on remote GPS receivers].").  SiRF was found to infringe even though the user of the GPS receiver had to perform some unclaimed acts such as initiating a download and connecting the device to the Internet.  *Id.*[28]

Similarly, in *Soverain*, the claim at issue was for a system comprising both a "buyer computer" and a web server.  The defendant server operator, citing *Centillion*, argued that it did not use the buyer computer and therefore could not be charged with "using" the claimed system as a whole.  The court denied the motion because, unlike Centillion, the defendant did not merely provide software that the buyer could install on the buyer computer; rather, in *Soverain*,

---

[28] Plaintiff's allegations are of *active* direction and control emanating from the server, completely distinguishable, therefore, from an argument that every Internet Service Provider "uses" every computer that merely accesses the ISP's server.

58

the delivery of ***Defendants' web page itself provides the programming required by the claims***; the user is not required to install anything.  Thus, Defendants' web server, by delivering web pages containing embedded programming, puts the system as a whole into service so that Defendants may benefit from the system.  Accordingly, Defendants use the system under § 271(a) by putting the system into service, i.e., controlling the system as a whole and deriving benefit from it.  Defendants' motion for judgment as a matter of law that it does not use the system claimed by the patents-in-suit is **DENIED**.

899 F. Supp. 2d at 581 (E.D. Tex. 2012) (emphasis added).  As in *Soverain*, the complaints here allege that the Defendants' web servers provide programming and/or electronic instructions which, when received by the players, put the players into service.

Defendants' brief, which focuses on the red-herring issue of direction and control over ***persons***, simply draws a complete blank with respect to the allegations concerning their electronic control, and therefore use, over the users' ***players***. Plaintiff alleges that control over the device makes the Defendants "users" thereof (as in *SiRF* and *Soverain*), and Defendants fail even to address, let alone raise grounds to dismiss, these allegations.

### 3. Allegations That "Defendants" Commit Infringing Acts Is Not "Divided Infringement"

Defendants argue that WAG's allegations, by using the plural form "Defendants," or by also accusing "Doe defendants," fail to show specific acts by an individual defendant.  This argument is specious.

"[T]he Federal Circuit has approved the use of a collective term within a patent infringement complaint to refer to acts of all defendants without distinction among the exact infringing acts performed by each one." *WesternGeco L.L.C. v.*

*Ion Geophysical Corp.*, 776 F. Supp. 2d 342 (S.D. Tex. 2011); *see also McZeal*, 501 F.3d at 1357 (holding that a complaint alleging only that "defendants" had offered an infringing product for sale, without regard to which of the two defendants specifically had offered the product for sale, contained "enough detail to allow the defendants to answer"); *Joao Control & Monitoring Sys., LLC v. Digital Playground, Inc.*, No. 12-CV-6781, slip op. at 3 n.2 (S.D.N.Y. Nov. 8, 2013) ("Defendants argue that any allegation that refers to Defendants collectively is insufficient . . . The Court, however, sees no reason not to interpret every allegation that 'Defendants' did something as a stand in for an allegation that 'Defendant A, Defendant B, . . . and Defendant Z' each did something.").

Defendants are conflating "joint" and "several" liability, arguing that they cannot be held jointly liable for infringement, and overlooking that they can nevertheless be severally accused as infringers.  WAG's allegations are indeed for "several" liability — the allegations of these complaints are sufficient against each of the Defendants individually.

Defendants (DBR at 23-24) cite to the Supreme Court case of *Limelight Networks, Inc. v. Akamai Techs.*, purporting to recite what that decision "held" on "§ 271(a) direct infringement," incorrectly stating that *Limelight* "held" that "direct infringement must be 'attributed to a single person.'"  134 S. Ct. 2111 (2014). *Limelight* held nothing whatsoever on § 271(a).  In fact, the Supreme Court explicitly declined to rule on direct infringement / § 271(a) because the question accepted for review was limited to § 271(b) and "***presupposes*** that *Limelight* has

not committed direct infringement under § 271(a)." *Id.* at 2120 (emphasis added).[29]

Defendants also cite (repeatedly) to *Richmond v. Lumisol Elec. Ltd.*, a case that was specifically not meant to be published, in which Judge Cooper specified that she "writes only for the parties."  No. 13–1944, 2014 WL 1405159, at *1 (D.N.J. Apr. 10, 2014).  *Richmond v. Lumisol* involved a plaintiff who "lump[ed] his direct infringement and indirect infringement claims into one lengthy and rambling count" and who sued multiple, clearly unrelated parties including Lumisol Electrical and Costco, without adequately specifying which defendant did what act to constitute infringement.  *Id.* at *1-3.

Here, each case involves parties that are similarly aligned and affiliated with each other.  They are related companies working together on the accused live streaming sites.[30]  Defendants work together to create the infringing sites.  As

---

[29] The Federal Circuit's *Muniauction* decision, implicitly questioned by the Supreme Court in *Limelight* (*Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117-18 (2014)) does say that an allegation of direct infringement of a method claim must be attributable to a single person.  But this is of no consequence because WAG, mindful of this requirement of existing Federal Circuit law, and of the facts as they exist in this case, specifically alleged facts sufficient to charge each of a plurality of Defendants severally with direct infringement. Despite an entire section of Defendants' brief attacking the straw man of Plaintiff's supposed "joint infringement" allegations (DBR at 41-44), in fact there are no such allegations in any of these complaints.

[30] E.g. – There are extensive allegations in the *Sobonito* case (No. 1661) against each of the three named Defendants, Sobonito Investments, Ltd., Coolvision Ltd., and I.M.L. SLU as discussed below in relation to jurisdiction.  These companies all claim responsibility and involvement with the accused live camera web sites.

noted above, it is entirely proper to read these allegations as stating each the designated defendants *each* engaged in conduct sufficient in itself to constitute direct infringement as alleged. *See WesternGeco*; *McZeal*; *Joao*, *supra*.

The presence of Doe Defendants changes nothing with respect to the pleadings. WAG has included Doe Defendants out of an abundance of caution, because businesses in this field can, and often do, set themselves up with deliberately opaque corporate structures. *Cf. K-Tech*, 714 F. 3d at 1286 ("A defendant cannot shield itself from a complaint for direct infringement by operating in such secrecy that the filing of a complaint itself is impossible.").

### POINT V.   PLAINTIFF ADEQUATELY PLEADS INDIRECT INFRINGEMENT

#### A. WAG Has Sufficiently Alleged The Actions Of The Defendants In Each Case

Defendants again argue, now with respect to indirect infringement, that WAG has "lump[ed] all Defendants together." DBR at 47-48. Plaintiff's allegations are sufficient to support its claims for indirect infringement as well.

Defendants rely entirely on the case of *Richmond v. Lumisol Elec. Ltd.*, distinguished above. As discussed above, there is nothing improper about a plural reference to "Defendants." Plaintiff alleges that each and every Defendant commits the acts constituting induced or contributory infringement.

*WesternGeco* is instructive. That case upheld both direct and indirect infringement claims alleged against "defendants" in the plural. WAG's complaints here, where they involve multiple defendants, all allege close alignment and

affiliation of the parties.  (E.g., Gattyán FAC ¶¶ 20, 53-54). [31]  WAG should not be expected to be able to see deeply into the Defendants' secretive internal structures to further resolve which of them perform which internal functions, at this stage.

*WesternGeco* held, with respect to similar allegations, as follows:

> WesternGeco's averments in its complaint, which we must accept as true, indicate that the Fugro Defendants operate as a world-wide integrated organization and under the trade name "Fugro Geo-team," which encompasses some or all of the Fugro Defendants.  At this stage, WesternGeco may not know which Fugro Defendant performed what role in the allegedly infringing activity.  However, the specific roles of each Fugro Defendant may be determined in discovery.  *See* [*McZeal*, 501 F.3d] at 1357–58 (holding that plaintiff's complaint fashioned on publicly available information about how defendants' purportedly infringing device was sufficient and that specifics could be determined through discovery).

776 F. Supp.2d at 363.  *Cf. K-Tech*, 714 F. 3d at 1286 ("A defendant cannot shield itself from a complaint for direct infringement by operating in such secrecy that the filing of a complaint itself is impossible.").

Defendants also **misstate** the decision in *Lumisol*, claiming it stands for the proposition that "a proper complaint **requires** naming 'only one Defendant per count for induced infringement.'"  DBR at 47 (emphasis added).  Judge Cooper instructed the plaintiff to name one defendant per count of inducement in that case, but said nothing about any such requirement for a proper complaint.  *Id.* at *4. There is no such requirement, and Defendants point to no controlling authority, but only to this non-published decision, explicitly written only for the parties, with

---

[31] WAG is citing to the First Amended Complaint in the *Gattyán Group* case as an example, but substantially similar allegations are present in the operative complaints in all eight cases.

different facts, which Defendants inappropriately misstate and overstate to stand for a non-existent legal requirement.

## B. WAG Undisputedly Pleads Inducement of the Acts That Are Alleged to Constitute Direct Infringement

The pleadings are very detailed and specific as to how Defendants induce the acts that constitute infringement.  WAG's complaints all expressly allege that customers' use of their players directly infringes claims 1-4 of the '011 patent (e.g., Gattyán FAC ¶ 94) and that their use of Player Software directly infringes claims 24-27 of the '141 patent (Gattyán FAC ¶ 76).  The complaints allege that it is ***impossible*** for users to use the Defendants' web sites without using the infringing players and player software.  (Gattyán FAC ¶¶ 77, 95.)  Further, WAG alleges that Defendants each induce infringement by recommending that consumers use players that are adapted to interoperate with Defendants' servers, and facilitates the use of such players by providing directions for such use and links to sites configured for such players, and in some cases providing specific software such as the "Docler Browser," a custom mobile "app" that is specifically configured for use with the infringing Player Software, for their customers' use (Gattyán FAC ¶¶ 78-79, 96-97), and a similar "B-Line Browser" from the Flying Crocodile Defendants (Flying Crocodile FAC ¶¶ 44, 76, 92).  In this way, Defendants effectively ***require*** their customers to infringe WAG's patents in order to gain access to their content, and assist them in doing so.  Thus, by making their service available and encouraging users to view it (and use their players to view it), Defendants necessarily induce users to infringe WAG's patents.  Defendants

cannot and do not dispute that the WAG's pleadings meet the first prong of the induced infringement test: that Defendants encourage the acts that constitute infringement.

## C. WAG Sufficiently Pleads Specific Intent to Cause Infringement

The Federal Circuit held in 2006 that induced infringement requires "that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (citation omitted). The Supreme Court clarified in its 2011 decision in *Global Tech* that "induced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement." 131 S. Ct. at 2068; *see also Fujitsu Ltd. v. Netgear Inc.,* 620 F.3d 1321, 1331-32 (Fed. Cir. 2010) (specific intent requirement is satisfied if an infringer "knew or should have known that its actions would induce actual infringement").

The foregoing does not require the plaintiff to "prove its case at the pleading stage." *Bill of Lading*, 681 F.3d at 1339. As *Bill of Lading* made clear, district courts must "draw all reasonable inferences in favor of the [plaintiff]," and the relevant inquiry is whether "there are sufficient facts alleged to render the [plaintiff's] asserted inferences plausible." *Id*. at 1340; *see also CreAgri, Inc. v. Pinnaclife Inc.*, No. 5:11-CV-06635, 2013 U.S. Dist. LEXIS 105952, at *13 (N.D. Cal. July 29, 2013) ("where, as here, a party, with knowledge of another party's patent, advertises or promotes its product for use in an infringing manner, this is sufficient to support an inference that the promoting party intended to induce infringement"). WAG's pleadings meet this standard easily.

Defendants contend that WAG's complaints fail to allege sufficient facts to raise even a plausible inference that Defendants "specifically intended" to induce their customers to infringe WAG's patents.  DBR at 48-51.  Defendants' analysis suggests that the allegations must go so far as to establish the defendant's *subjective* state of mind, and of course this is incorrect.

WAG's complaints allege that Defendants "actively and knowingly abetted" their customers' infringement with respect to both the '141 patent and the '011 patent, and they plead specific facts to support these allegations.  *DSU Med. Corp.*, 471 F.3d at 1306.  (*See* Gattyán FAC ¶ 81 (Defendants had knowledge of the '141 patent in May 2014, and continued to induce infringement with that knowledge); ¶ 99 (same with respect to the '011 patent); ¶¶ 77-79, 95-97 (factual bases for alleging that defendants "actively and knowingly abetted")).

The present induced infringement allegations involve patent claims to a "product" – the user's player – alone, and the consumer's direct infringement results from *any* use of the patented product.  The Defendants here, once they knew of WAG's patents, had more than ample reason to know the players are infringing under the facts as pleaded.  Defendants *know* that their users use players and player software, and this is alleged.  (Gattyán FAC ¶¶ 77, 78, 95, 96.)  The Defendants *know* that the user is using functionality built into the Player for pulling streams divided into chunks.  They *know* the user is doing this because their server sets up and directs the download of the requisite chunks.  (Gattyán FAC ¶¶ 62-65.)  This would not work unless the Player functioned as claimed in

WAG's patents.  (Gattyán FAC ¶ 77 (alleging that Defendants' "streams are only viewable on Players so configured.")).

Thus, WAG has pleaded facts under which it plausibly may be inferred that Defendants know full well that the users are directly infringing and intended this consequence, or that Defendants are being willfully blind to this fact.  (Gattyán FAC ¶¶ 81, 99.)  Under *Bill of Lading*, allegations supporting a plausible inference of intent to cause infringement suffice for pleading induced infringement.  *See also Walker Digital, LLC v. Facebook, Inc.*, 852 F. Supp. 2d 559, 563-65 (D. Del. 2012) (summarizing allegations and holding that the defendant's "decision to continue its conduct despite the knowledge gleaned from the complaint satisfies the requirements of *Global–Tech*").

## D. Controlling Authority Holds that Knowledge Provided By The Complaint is Sufficient to Support a Claim for Induced Infringement

Defendants claim that *Global Tech* requires an allegation of "pre-suit" knowledge of the patents-in-suit.  DBR at 48 & n.19 (citing to 131 S. Ct. at 2068).  Plainly, *Global Tech* contains no such statement on that page or anywhere else.[32]

---

[32] Defendants then back this off to the obvious statement that "there is no pre-suit liability for induced infringement where there is no pre-suit knowledge."  DBR at 49.  This is another straw man, as Plaintiff has asserted no such claims — all of its inducement claims seek damages only prospectively from the date the respective Defendants had notice of WAG's patents.  *E.g. Gattyán* FAC ¶ 100.  *See Trans Video Elecs., Ltd. v. Netflix, Inc*., Civ. Act. No. 12-1743-LPS, 2014 WL 900929, at *3 (D. Del. Mar. 4, 2014), *report and rec. adopted*, 2014 WL 1268680 (D. Del. Mar. 26, 2014) ("[t]o the extent Plaintiff intends to limit its allegations to the time period after it served the Complaint, … sufficient knowledge of the patent's existence is provided by the Complaint's filing").

The overwhelming weight of well-reasoned recent authority holds that "there is no legal impediment to having an indirect infringement cause of action limited to post-litigation conduct." *Walker Digital, LLC v. Facebook, Inc.*, 852 F. Supp. 2d 559, 565 (D. Del. 2012). In *Bill of Lading* the Federal Circuit upheld an induced infringement claim based on allegations that the accused inducer "became aware of the '078 patent, at the latest, in March of 2009 ***when it was served with the complaint***." 681 F. 3d at 1345 (emphasis added); *see also Labyrinth Optical Technology, LLC v. Fujitsu America, Inc.*, No. 13-cv-00030, slip op. at 7-9 (C.D. Cal. Aug. 21, 2013) (reviewing conflicting authority and concluding that *Bill of Lading* "settled the issue" and is "binding authority" for the position that sufficient awareness is provided by a complaint that identifies the patents-in-suit.).[33]

---

[33] *Accord EON Corp. IP Holdings, LLC v. Sensus USA, Inc*. No. C-12-1011 EMC, 2012 WL 4514138, at *1 (N.D. Cal. Oct. 1, 2012); *Oy Ajat, Ltd. v. Vatech America, Inc.*, No. 10-CV-4875, 2011 WL 1458052, at *3 (D.N.J. Apr. 14, 2011) (Plaintiff may proceed with Plaintiff's claim for induced patent infringement after Plaintiff served Vatech America Inc. with Plaintiff's Complaint."); *Schindler Elevator Corp. v. Otis Elevator Co.*, No. 09-CV-0560 (DMC), 2010 WL 1032651 (D.N.J. Mar. 16, 2010) ("official notice" by reason of service was sufficient to support claim for induced infringement); *Execware, LLC v. Staples, Inc*., No. 11-836-LPS-SRF, 2012 WL 6138340, at *5 (D. Del. Dec. 10, 2012), *report and rec. adopted*, 2013 WL 171906 (D. Del. Jan. 16, 2013) (citing *Walker Digital,* 852 F. Supp. 2d at 565*)*; *SoftView LLC v. Apple Inc*., Civ. Act. No. 10-389-LPS, 2012 WL 3061027, at *7 (D. Del. July 26, 2012) ("an accused infringer is on notice of the patent(s)-in-suit once an initial pleading identifies the patents-in-suit"); *Apeldyn Corp. v. Sony Corp*., 852 F. Supp. 2d 568, 573-74 (D. Del. 2012) (same); *British Telecomms. PLC v. Google Inc*., No. 11-1249-LPS, slip op. at ¶ 5 (D. Del. Sept. 20, 2012) (same); *Minkus Elec. Display Sys. Inc. v. Adaptive Micro Sys. LLC*, No. 10-666-SLR, 2011 WL 941197, at *4 (D. Del. Mar. 16, 2011) ("all defendants will be deemed to have knowledge [of the patent] as of the date the complaint was

Defendants cite to three contrary district court decisions from 2009, 2010, and 2011 (DBR at 48 n.121), but all three cases were decided before the Federal Circuit decided this issue in *Bill of Lading* on June 7, 2012.  681 F.3d 1323 (Fed. Cir. 2012).[34]

Accordingly, controlling case law makes clear that the complaint itself is sufficient to satisfy the knowledge requirement of a claim for induced infringement.[35]

---

filed"); *3D Sys., Inc. v. Formlabs, Inc*., No. 13 Civ. 7973, 2014 WL 1904365 (S.D.N.Y. May 12, 2014); *Smartwater, Ltd. v. Applied DNA Sciences, Inc*., No. 12-CV-5731 (JS) (AKT), 2013 WL 5440599, at *8 (E.D.N.Y. Sept. 27, 2013); *Automated Transactions, L.L.C. v. First Niagara Financial Group, Inc*., No. 10-CV-0407 (A) (M), 2010 WL 5819060, at *6 (W.D.N.Y. Aug. 31, 2010).

[34] Even Cases that require pre-suit knowledge permit the addition of inducement counts in an amended complaint.  All but one of the complaints in these cases have been amended.  When these amended complaints were served, the Defendants in these seven cases had been aware of WAG's patents for a considerable time.  As *Zond, Inc. v. Fujitsu Semiconductor Ltd*., 990 F. Supp. 2d 50, 57 (D. Mass. 2014), concludes, even if there were no ground to allege inducement in an initial complaint, nothing would "prevent a plaintiff from filing and then subsequently amending its filing were the defendant to continue to induce others to infringe." That has occurred in seven of the eight cases here.

*Rembrandt Social Media, LP v. Facebook, Inc*., 950 F. Supp. 2d 876, 882 (E.D. Va. 2013), reaches the same conclusion:

> [I]f a putative infringer continues to engage in indirect infringement of a patent after the filing of the suit, then a plaintiff may recover damages. … [I]f such an initial complaint fails to plead knowledge adequately, the appropriate relief would be dismissal without prejudice.  The patentee could then file, as here, an amended complaint that alleges indirect infringement with notice of the patent in issue based on the filing of the original complaint.

[35] Some of WAG's complaints or amended complaints (*e.g.*, *MFCXY* Case No. 3196, First Amended Complaint (D.I. 18) ¶ 101; *Vubeology* Case No. 4531, Complaint (D.I. 1) ¶¶ 31-34) allege prior awareness of WAG's patents, and

**E. Plaintiff Sufficiently Pleads Contributory Infringement**

Plaintiffs pleaded "contributory infringement" under 35 U.S.C. § 271(c) in only two of these eight cases, the *Sobonito* and *Vubeology* cases. In each of these two cases, the Defendants' server actually transmits a software component to the user's player that turns the player into an infringing article. The component is specifically adapted to infringe WAG's patents and has no conceivable use other than to be used in the patented configuration.

Defendants argue that WAG has not adequately pled knowledge of the patents and infringement in these two cases. Similar to the discussions for induced infringement under 35 U.S.C. § 271(b) above, WAG has adequately pled that these two Defendants had knowledge of the patents and of their infringement at least as early as the filing of the initial complaint in each of their cases. Plaintiff has pled additional knowledge in the case of Vubeology because of the overlapping personnel between Vubeology and Flying Crocodile, Inc., against which an action was commenced almost three months prior to the action against Vubeology. Defendants attack this assertion (DBR at 50), but when they first learned of the patent only presents a question of damages and is not a ground for dismissal.

The majority of courts, and the better reasoned decisions, find alleging post-suit knowledge is sufficient for a claim for contributory infringement occurring and continuing after the filing of the complaint. *See, e.g.*, *Trading Tecs. Int'l, Inc. v.*

---

Defendants argue over the sufficiency of these allegations. DBR at 50. Since notice upon filing is sufficient, these arguments only go the quantum of damages, not dismissal.

*BCG Partners, Inc.*, No. 10 C 715, 2011 WL 3946581, at *4 (N.D. Ill. Sept. 2, 2011); *Symantec Corp. v. Veeam Software Corp.*, No. C 12-00700 SI, 2012 WL 1965832, at *4 (N.D. Cal. May 31, 2012).).

Defendants also argue that "software that is transmitted . . . is not a 'component' under the patent statute." (DBR at 56.)  Defendants do not specify which provision of the "patent statute" they refer to, and cite the U.S. Supreme Court decision in *Microsoft Corp. v. AT&T Corp.*, 127 S. Ct. 1746 (2007), which is a ruling under 35 U.S.C. § 271(f), not § 271(c), and there is an important difference between the two provisions.  *Microsoft v. AT&T* clearly states that the software embodied in a tangible copy *is* a component under § 271(f).  127 S. Ct. at 1755-56.  WAG's complaints allege that Defendants create such a copy on the user's player by including this software along with their web pages, which creates a tangible copy when received by the user's player or browser.  *See Sobonito* Case No. 1661 Second Amended Complaint (D.I. 26) ¶¶ 69, 73, 91-94, 117-120; *Vubeology* Case No. 4531, Complaint (D.I. 1) ¶¶ 43, 48, 66-68, 92-94.  Section 271(f) by contrast further requires that the "component" be supplied "from the United States," which is a problem under § 271(f), where the software does not become a "component" until it reaches its foreign destination.  However, § 271(c), at issue here, has no requirement about where the component is provided. *Microsoft v. AT&T* is therefore inapposite.  Providing the software on the user's player or browser is sufficient under § 271(c).

Accordingly, Plaintiff sufficiently pleads contributory infringement under 35 U.S.C. § 271(c) in the *Sobonito* and *Vubeology* cases.

### POINT VI.   PLAINTIFF ADEQUATELY PLEADS WILLFUL INFRINGEMENT

Defendants have known since at least the filing of the initial complaint in each case, if they did not know this before, that their conduct infringes Plaintiff's patents.  Assuming, as is required at this stage, that Plaintiff's infringement assertions are true, this necessarily implies that Defendants' current, continued infringing conduct is willful.

Defendants contend that, where a claim of willfulness is based solely on post-filing conduct, the claim ***must*** nevertheless be dismissed unless the plaintiff first makes a motion for a preliminary injunction.

Defendants' argument is based on an apparent misunderstanding of the Federal Circuit's holding in *In re Seagate Technology, LLC*, 497 F.3d 1360 (Fed. Cir. 2007) (*en banc*), which establishes no such *per se* rule.  Rather, *Seagate* holds that "it is likely" that a plaintiff that does not win a preliminary injunction will not be able to meet the high standard for willfulness.  *Seagate* acknowledges, however, that a plaintiff who cannot meet the element of injunctive relief that requires a likelihood of irreparable harm may nonetheless be entitled to plead willfulness. That is precisely WAG's position.  Because WAG and Defendants do not compete for business, WAG's injury from Defendants' infringement is monetary.  Thus, WAG cannot likely satisfy the irreparable harm element that is ordinarily required for a preliminary injunction to be granted.  It would be perverse (and unwarranted) to bar WAG from claiming damages for willful infringement on the ground that its injury is not "irreparable" because it can be satisfied by money damages.

*Seagate* arose, not from a dispute over pleading rules, but over a discovery dispute.  It is an *en banc* decision on a mandamus petition from an order to compel discovery of post-filing legal advice that might be relevant to the allegation of continuing willful infringement.  Proceeding from a clear concern to protect the attorney-client privilege, the court's resolution began by modifying the substantive law of willful infringement – itself a landmark ruling – by holding for the first time that willful infringement requires a showing, by clear and convincing evidence, of infringing conduct, that if not actually intentional, rises to at least the level of reckless disregard for patent rights.  497 F.3d at 1371.  Since reckless conduct also ordinarily should entitle the plaintiff to injunctive relief, the *Seagate* opinion observes that a plaintiff's failure to seek a preliminary injunction may reflect the plaintiff's own conclusion that defendant's conduct cannot support a willfulness claim under the court's heightened willfulness standard.  *Seagate*, however, did not purport to address all facts and circumstances in advance or to promulgate a blanket rule of pleading such as that advocated by Defendants, that a preliminary injunction motion is ***always*** necessary.

*Seagate* is clear on this point:

> [W]hen an accused infringer's post-filing conduct is reckless, a patentee can move for a preliminary injunction, which ***generally*** provides an adequate remedy for combating post-filing willful infringement … A patentee who does not attempt to stop an accused infringer's activities in this manner should not be allowed to accrue enhanced damages based solely on the infringer's post-filing conduct.  Similarly, if a patentee attempts to secure injunctive relief but fails, ***it is likely*** the infringement did not rise to the level of recklessness…

We also recognize that in **some cases** a patentee may be denied a preliminary injunction despite establishing a likelihood of success on the merits, such as when the remaining factors are considered and balanced.  **In that event, whether a willfulness claim based on conduct occurring solely after litigation began is sustainable will depend on the facts of each case**.

497 F.3d at 1374 (emphasis added).

As the *Seagate* decision recognized in the passage quoted above, the unavailability of preliminary injunctive relief may concern factors **other than** likelihood of success on the merits.  In such a case, **the fact that plaintiff did not move for a preliminary injunction does not make the allegation of willful infringement any less plausible**.  In such cases, if the allegations of willful infringement are plausible (as required by *Twombly* and *Iqbal*), the pleading should be allowed.  *Seagate*, which does not address pleading requirements at all, surely does not affect the Supreme Court's holding in *Twombly*, or suggest that a departure is necessary from the Court's later decision in *Iqbal*.  Where, as here, the complaint alleges facts under which willful infringement meeting the substantive requirements of *Seagate* is plausible, that should end the pleading inquiry.

Although Defendants cite a handful of cases that have ruled to the contrary, cases that have ruled on circumstances similar to those involved here support Plaintiff's position.  These cases hold that *Seagate* does not alter the standards for pleading.  The courts in those cases have declined to adopt a *per se* rule requiring a preliminary injunction motion regardless of the circumstances.  *Englishtown, Inc. v. Rosetta Stone Inc*., 962 F. Supp. 2d 355 (D. Mass. 2013), is directly on point. Before the court was a motion to amend the complaint to add a claim of continued willful infringement based on post-filing conduct.  *Id*. at 358.  The plaintiff there

did not compete with the defendant, no longer practiced the patents in suit, and did not move for a preliminary injunction.  The defendant took the position that Defendants take herein, *i.e.*, that such a willful infringement claim was untenable because the plaintiff had not moved for a preliminary injunction.  *Id.* at 359.

The court in *Englishtown* rejected the defendant's assertion that *Seagate* imposes a *per se* injunction rule.  *Id.* at 358.  Citing *DataQuill Ltd. v. High Tech Computer Corp.*, 887 F. Supp. 2d 999 (S.D. Cal. 2011), the *Englishtown* court declined to require the plaintiff to seek a preliminary injunction in order to assert a claim for willful infringement based on post-filing conduct because "requiring it to seek a preliminary injunction would be a waste of this Court's time and resources." *Englishtown*, 962 F. Supp. 2d at 359.

In *DataQuill*, relied upon in *Englishtown*, the court exhaustively analyzed *Seagate* and concluded that the plaintiff's failure to have sought a preliminary injunction was not a bar to a willful infringement claim, where there were strong allegations of willful conduct, but irreparable harm could not be shown.  *DataQuill Ltd.*, 887 F. Supp. 2d at 1016-18.  The court refused to hold that plaintiffs should be required to file frivolous motions:

> HTC [the defendant] argues that in *Seagate*, the Federal Circuit recognized that "in some cases a patentee may be denied a preliminary injunction despite establishing a likelihood of success on the merits, such as when the remaining factors are considered and balanced.  ***In that event***, whether a willfulness claim based on conduct occurring solely after litigation began is sustainable will depend on the facts of each case."  *Seagate*, 497 F.3d at 1374 (emphasis added).  HTC argues that this language implies that even though a patentee might think that he will be denied a preliminary injunction, the patentee should still request the injunction, and only after the Court denies the injunction, should the Court determine whether the patentee

> may proceed on its willfulness claims.  However, the Court declines to read *Seagate* in such a narrow manner as to require all patentees seeking claims for post-filing willful infringement to file motions for preliminary injunctions in every situation no matter how frivolous they may be.

*Id*. at 1016-17 (citations omitted).  The court concluded that the plaintiff's claim for willful infringement was "not barred as a matter of law because it did not seek a preliminary injunction in this case."  *Id*. at 1017.  *See also Zond, LLC v. Renesas Elecs. Corp.*, No. 13-11625-NMG, 2014 U.S. Dist. LEXIS 114363, at *12-13 (D. Mass., Aug. 15, 2014) (where plaintiff practiced the patented technology but did not directly compete with defendant, court found that "seeking preliminary injunctive relief would have been futile" and that "plaintiff may proceed on its claim of willful post-filing infringement"); *Affinity Labs of Tex., LLC v. Alpine Elecs. of Am., Inc*., No. 9:08-CV-171, 2009 WL 9091275 (E.D. Tex. Sept. 2, 2009); *ACCO Brands, Inc. v. PC Guardian Anti-Theft Prods., Inc*., 592 F. Supp. 2d 1208, 1227 (N.D. Cal. 2008).

In *Affinity Labs*, the court rejected the argument that the plaintiff there "cannot raise a willfulness claim based solely on post-filing conduct without first seeking a preliminary injunction," stating: "[a]ccepting the facts pled in Affinity Labs's complaint as true, the complaint states a claim to relief that is plausible on its face."  2009 WL 9091275 at *4.

The cases cited above make clear that Federal Circuit's decision in *Seagate* does not amend or override the pleading standards established by the Supreme Court in *Twombly* and *Iqbal*.  The facts alleged in the present case plausibly state a claim that Defendants' continuing infringement, since being notified of Plaintiff's patents, has been willful.  It is also clear from the facts alleged in the operative complaints that the parties do not compete.  Plaintiff's allegations of willfulness are no less plausible because Plaintiff has not sought a preliminary injunction, where such relief would not be available for reasons other than likelihood of success on the merits.

Accordingly, Defendants' motion to dismiss Plaintiff's willful infringement claim must be denied.

### POINT VII.   WAG'S COMPLAINT SUFFICIENTLY ALLEGES JURISDICTION OVER DEFENDANT COOLVISION

In the *Sobonito* action (Case No. 1661), Defendant Coolvision Ltd. ("Coolvision"), an Israeli corporation, moves to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction.  There is no question that the operators of the imlive.com and related web sites (collectively, the "Sobonito Defendants") are engaged in activities in the U.S. and particularly in New Jersey sufficient to support jurisdiction.  Coolvision does not deny the sufficiency of these activities, only its links to them.

The Second Amended Complaint against Coolvision (D.I. 26) ("SAC") sufficiently alleges that Coolvision is in fact the main mover with respect to

imlive.com and related websites.  Since the activities of those sites are sufficient to support jurisdiction, Coolvision's responsibility for those activities subjects it to such jurisdiction.

## A. Legal Standards for Personal Jurisdiction

In patent infringement cases, the Federal Circuit applies its own law regarding personal jurisdiction.  *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1016 (Fed. Cir. 2009); *Jakks Pac., Inc. v. Conte*, No. 11–479, 2011 WL 6934856, at *3 (D.N.J. Dec. 30, 2011).

"Determining whether jurisdiction exists over an out-of-state defendant involves two inquiries: whether a forum state's long-arm statute permits service of process and whether assertion of personal jurisdiction violates due process." *Autogenomics*, 566 F.3d at 1017 (internal citation omitted).  Where, as in New Jersey (*see IMO Indus. Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3rd Cir. 1998)), a state's long-arm statute is co-extensive with the limits of due process, the jurisdictional inquiries "collapse into a single inquiry: whether jurisdiction comports with due process." *Autogenomics*, 566 F.3d at 1017.

Plaintiff relies on specific jurisdiction, which involves a three part test:

(1) the defendant purposefully directed its activities at residents of the forum, (2) the claim arises out of or relates to those activities, and (3) assertion of personal jurisdiction is reasonable and fair.

*Id.* at 1018.  With respect to the last factor (fairness), the burden of proof is on the defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable" under the Supreme Court's standard outlined in *Burger King v. Rudzewicz*, 471 U.S. 462, 477-78 (1985).

To overcome a motion pursuant to Rule 12(b)(2), the plaintiff need only show a prima facie case that jurisdiction exists.  "In the procedural posture of a motion to dismiss, a district court must accept ***the uncontroverted allegations in the plaintiff's complaint as true*** and resolve any factual conflicts in the affidavits in the plaintiff's favor." *Jakks Pac.,* 2011 WL 6934856, at *3 (quoting *Autogenomics*, 566 F.3d at 1017) (emphasis added).  "[T]he pleadings and affidavits are to be construe[d] . . . in the light most favorable to the plaintiff." *Silent Drive, Inc. v. Strong Indus., Inc*., 326 F.3d 1194, 1201 (Fed. Cir. 2003) (internal quotations omitted).  "[W]here the plaintiff's factual allegations 'are not directly controverted, [they] are taken as true for purposes of determining jurisdiction . . . '" *Akro Corp. v. Luker*, 45 F.3d 1541, 1543 (Fed. Cir. 1995) (quoting *Beverly Hills Fan Co. v. Royal Sovereign Corp*., 21 F.3d 1558, 1563 (Fed. Cir. 1994)).

An additional consideration applies to foreign defendants such as Coolvision.  Coolvision argues that WAG must show that Coolvision has sufficient contacts with New Jersey to establish personal jurisdiction.  DBR at 62, 64.  This is incorrect, in that it fails to take account of Federal Rule 4(k)(2).  Fed. R. Civ. P. 4(k)(2).  If a defendant contends that it "cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)." *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1293-94 (Fed. Cir. 2012).  Under Rule 4(k)(2), a federal claim may be asserted against a foreign defendant if it "has sufficient contacts with the United States ***as a whole*** to satisfy due process standards." *Id.* at 1294 (emphasis added).  Therefore, WAG need only

show that Coolvision has sufficient contacts either with New Jersey, or

alternatively with the United States as a whole.

**B. The SAC Alleges Sufficient Activities Related to the Alleged Infringement in New Jersey And Elsewhere in the U.S.**

The uncontroverted allegations and evidence submitted herewith show the

following:

- Imlive.com is transmitted over an infringing server physically located in or around Newark, NJ, in close proximity to this Court.  (SAC ¶ 36.)

- Imlive.com also transmits from another infringing server physically located in Arlington, Virginia.  (SAC ¶ 36.)

- Imlive.com has numerous performers from New Jersey, who perform online over Defendants' infringing services, from New Jersey, through server facilities provided by Defendants.  (SAC ¶ 47.)

- Defendants' highly interactive web sites (see Point VIII below) have a substantial volume of users in this district.  (SAC ¶ 50.)

- In addition to doing commerce with such users in this district, Defendants induce them to directly infringe.  (SAC ¶¶ 74-79.)

- Defendants derive substantial revenues from users in this District.  (SAC ¶ 50.)

- Amazon.com's Internet "metrics" site, Alexa, shows that the U.S. is the biggest worldwide market for imlive.com.  (Abramson Decl., Ex. 2.)

Each of these activities directly relates to commission of the alleged

infringing activities or the economic benefits derived therefrom.  This meets the

requirement that "the claim arises out of or relates to" activities "purposefully

directed . . . at residents of the forum."  Defendants' brief does not even attempt to

argue to the contrary.  The only issue it raises is with respect to Coolvision's links

to the infringing activities.

### C. Express Admissions and Other Competent Evidence Clearly Support Jurisdiction Over Coolvision On the Basis of Its Responsibility for the Accused Websites

Coolvision's admissions, the SAC, and the additional documents submitted herewith show that Coolvision controls the alleged infringing activity of imlive.com, and as such is responsible for the resulting infringement.

Coolvision's CEO, Noam Fogel, **admits** that Coolvision performs "maintenance," "technical support," "monitoring," and "technical administrative duties" for the website located at www.imlive.com.  Declaration of Noam Fogel, ¶¶ 1, 17.  Mr. Fogel's admission of administrative and technical control confirms specific allegations in the SAC.  (SAC ¶¶ 32-34.)  While these admissions are sufficient in themselves to support a *prima facie* case of Coolvision's responsibility for the alleged acts relating to infringement directed at this forum, what Fogel admits is merely the tip of the iceberg.

Further support for Coolvision's responsibility for the infringement-related activities directed to the forum includes the following:

- Coolvision and Defendant I.M.L. SLU ("IML") are alleged to be "commonly owned and controlled" (SAC ¶ 4); Defendants Sobonito Investments, Ltd. ("Sobonito") and I.M.L. SLU ("IML") are alter egos of Coolvision. (SAC, ¶ 43.)  IML is a "closely held affiliate" of Coolvision (SAC ¶ 22); Coolvision, Sobonito and IML act in concert with each other (SAC ¶ 50); Coolvision is in "operational control" of all U.S. activities of the Defendants IML and Sobonito (SAC ¶ 48).

- The domain globalmailer, from which imlive.com content originates, has registered IP addresses with a "Point of Contact" pointing to an email address registered to Coolvision (SAC ¶¶ 31, 32, 36).

- Coolvision designed the imlive.com website.  (SAC ¶ 34.)  LinkedIn profiles of Coolvision employees responsible for the site's design are attached hereto as Exhibit 3 to the Abramson Declaration.  (Abramson Decl., Ex. 3.)

- In January 2014, Israel's daily newspaper of record, *Ha'aretz*, reported in its English language edition on a television investigative program concerning the prominent art collector Muly Litvak.  The paper reported that Litvak "operates the site IMLive," which is "one of several porn chat sites" he owns, which he manages through his company Coolvision.  The article stated that "Coolvision and IMLive do not produce pornographic material, and instead, according to a spokesperson, provide "Internet platforms for virtual encounters."  (Abramson Decl., Ex. 4.)

- Previously, in September 2009, *Ha'aretz* reported that "Coolvision, an Israeli company that runs one of the largest online pornography networks and rakes in hundreds of millions of dollars a year," was considering an initial public offering.  (Abramson Decl., Ex. 5.)  Coolvision, the article noted, is 98.5% owned by Muly Litvak.  The article reported that: "Coolvision manages dozens of porn site[s] and develops technology platforms for displaying video content at sex sites.  These sites include live content of a sexual nature and online chat  . . .  Although the sites themselves are apparently not owned by Coolvision, *the company receives a large chunk of its revenues for operating them and developing Internet technologies for them.*" *Id.* (emphasis added.)

- The 2009 article states that Coolvision has "140 employees, mostly software developers and Web site managers," engaged in "development."  (These employees are highly visible today on LinkedIn and popular "resume" websites.)  *Id.*

- The 2009 article also reports that "[t]he company's operations are connected with those of Sobonito Investments … Sobonito is registered in Limassol, Cyprus *and owns a large share of the sites managed by Coolvision*."  *Id.* (emphasis added).  Although Sobonito is registered in Cyprus, the article reports that the work of operating the sites is performed by Coolvision in Tel Aviv.  *Id.*

- Further according to the 2009 article, "Coolvision attracts clients with banner ads, film clips and pop-up windows that try to engage viewers in conversation.  'The pop-up windows are operated from offices a few blocks away from the head office in the Museum Tower [in Tel Aviv],' says a former employee.  Most of the strippers are not Coolvision employees, but

rather subscribers who have opened accounts with Coolvision, to make money from video chats by keeping viewers 'chatting.'  About 10 percent of the money they earn for Coolvision will be transferred to the account they opened via the company's customer service department on the 23rd floor of the Museum Tower."  *Id.*

- Coolvision coordinated the defense of Sobonito in a U.S. copyright lawsuit, *Ventura Content, Ltd. v. UGC Internet Ventures, Ltd.*, Case No. 1:12-cv-2856 (N.D. Ga.).  (SAC ¶ 20.)

- The affidavits in the *Ventura* case included one from Mr. Fogel.  (Abramson Decl., Ex. 6.)

Mr. Fogel's declaration seeks to rebut some of these allegations and evidence, but with very narrow and limited factual statements.  Defendants' brief departs from those facts in an attempt to make stronger arguments.

Mr. Fogel does not deny that Coolvision developed the technology used by the subject sites, or that it maintains and operates them.  He does not in any way deny the alleged activities of the accused web sites, or the reach of those activities into New Jersey and otherwise into the U.S.

Furthermore, while the allegations of infringement herein go back at least to 2012, Mr. Fogel's statements, in the declaration dated September 21, 2014, revert to present tense whenever he addresses the relationships among the defendants, thereby conveying no information about their past relationships.

On a jurisdictional motion, allegations not "directly controverted" by affidavit testimony are "taken as true."  In *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, the complaint alleged that defendant was "purposefully shipping and selling . . . , through intermediaries, the accused [items] to customers in Virginia."  The Federal Circuit held these allegations were not directly

controverted by an affidavit that "only denies direct shipments and sales;" because the allegations were not "directly controverted" by affidavit testimony, they were "taken as true."  An affidavit that was "either inartfully phrased or craftily written" "does not directly contravene plaintiff's allegations; again, plaintiff's factual allegations must be taken as true."  *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1563 (Fed. Cir. 1994).  Thus, statements in Defendants' brief are not enough to controvert Plaintiff's allegations; without affidavit testimony that directly refutes them, the allegations must be credited as true in establishing a prima facie case of jurisdiction.

Moreover, pleadings and affidavits are to be construed in the light most favorable to the plaintiff.  *Silent Drive, Inc. v. Strong Indus., Inc*., 326 F.3d 1194, 1201 (Fed. Cir. 2003); *accord*, *Graphic Controls Corp. v. Utah Med. Prods., Inc*., No. 96–CV–0459E(F), 1997 WL 276232, at *2 (W.D.N.Y. May 21, 1997), *aff'd*, 149 F.3d 1382 (Fed. Cir. 1998) ("the pleadings and affidavits are construed in the light most favorable to, and any ambiguity is resolved in favor of, the plaintiff.").  Accordingly, where Mr. Fogel fails to address or does not squarely deny an allegation of the SAC, that allegation must be taken as true for purposes of this motion.  *Campbell Pet Co. v. Miale*, 542 F.3d 879, 888 (Fed. Cir. 2008) ("[u]nless ***directly contravened***, [the plaintiff's] version of the facts is taken as true") (emphasis added).

Mr. Fogel's declaration on its face is extremely limited.  Defendants' brief takes liberties with Mr. Fogel's testimony in order to make it seem to say more than it does, and minimize Coolvision's operational role in imlive.com.  Page 64 of

Defendant's brief states: "Coolvision simply performs some ***elementary*** administrative tasks for that website." DBR at 64 (emphasis added). The entirety of Mr. Fogel's statements on this subject is at ¶¶ 1 and 17 of his declaration and they do not characterize the admitted administration as "elementary." The Court must go by Mr. Fogel's actual testimony and the other competent submissions herein, not the arguments in a brief. "Attorney argument is not evidence." *Elcommerce.com v. SAP AG*, 745 F.3d 490, 506 (Fed. Cir. 2014) (vacated per stipulation of dismissal).

Defendant's brief, again taking liberties with the evidence, states that "Coolvision has [present tense] no affiliation or common ownership . . . with the other named defendants." DBR at 64-65 (citing to ¶¶ 13-16 of Mr. Fogel's declaration). Mr. Fogel's declaration merely states that "Coolvision is not controlled or managed ***by***" IML (¶ 14) and that "Coolvision is not controlled or managed ***by***" Sobonito (¶ 15) (emphasis added). These are very limited statements, and neither of these statements nor anything else in Mr. Fogel's submission addresses Coolvision's direct or indirect ownership ***of*** the other parties, or whether they are affiliated, have a common shareholder, or are otherwise under common ownership or control with Coolvision – past or present. The seemingly broad (but actually very limited) denial of affiliation or common control in Defendants' brief is in any case unfounded, beyond the evidence submitted, and entitled to no weight.[36]

---

[36] Defendants' brief again refers to Plaintiff's allegations of common ownership

The Fogel Declaration denies direct ownership of servers.  Fogel Decl. ¶¶ 14-15.  He specifically avoids saying who owns them, and does not deny Coolvision's participation in the infringing conduct.  Coolvision's participation is in any case well supported by Mr. Fogel's admission; IP address registration records showing Coovision as a "Point of Contact"; numerous press accounts linking Coolvision to the operation of imlive.com; Mr. Litvak's own web page taking credit for the site; and multitudes of employee listings on LinkedIn and resume sites with detailed descriptions of their extensive involvement in the design, marketing, and day-to-day operation and administration of the site.

Read most charitably, Mr. Fogel's declaration here may be read to suggest that Coolvision functions as an "outsourcer" for IML and/or Sobonito, which nominally run the accused sites.

Fundamentally, however, his declaration fails, because if, as it would appear, Coolvision is the entity that administers and runs the offending web sites for the other entities, it is liable for its own tortious acts.  *See* § 7.03, Restatement (Third) of Agency (2006) ("An agent is subject to liability to a third party harmed by the agent's tortious conduct."); *see also D.L. Auld Co. v. Park Electrochemical Corp.* 553 F. Supp. 804, 808 (E.D.N.Y. 1982) ("One corporation may become an actor in a given transaction, or in part of a business, . . . and, when it has, will be legally responsible.") (internal quotations omitted).  Mr. Fogel's denials of Coolvision's

---

and control at page 67, but the discussion that follows addresses other issues, sidestepping the issue of common ownership and control.  DBR at 67.

ownership of the server facilities are of no avail, because such ownership is irrelevant. [37]

Furthermore, many assertions in Mr. Fogel's declaration are at odds with other available evidence.

The Fogel Declaration states that Coolvision does no marketing or advertising for websites, domains or subdomains named in the SAC. Fogel Decl. ¶ 20. Exhibit 7 of the Abramson Declaration contains copies of LinkedIn profiles showing Coolvision employees representing that they market Defendants' websites. Abramson Decl., Ex. 7.

The Fogel Declaration states that Coolvision does not recruit or employ performers, and has no employees in common with the other Defendants. Fogel Decl. ¶¶ 14, 22. Exhibit 8 of the Abramson Declaration is a copy of a resume posted on the resume site, Yatedo, showing a manager, self-identifying as having been the "Business Development Manager - IML - Internet Marketing Ltd (CoolVision)," who said he was responsible for developing "partnerships" with "web-content suppliers" in "Eastern Europe and CIS countries." Abramson Decl.,

---

[37] Defendants cite *Lottotron, Inc. v. Athila Station*, No. CIV.A. 10-4318 JLL, 2011 WL 2784570 (D.N.J. July 11, 2011) (*see* DBR at 66, n.193), with the parenthetical "dismissing patent complaint for lack of personal jurisdiction *because* defendant did not own the websites at issue." (emphasis added by WAG). Defendant's parenthetical states one party's argument, not the court's holding. *Id*. at *2. The court there found that neither the amended complaint, nor any submission in response to the defendant's affidavit, established a prima facie case of jurisdiction on their face (*id*. at *2-*3, nn. 1 & 3), instead finding that "plaintiff has entirely failed to put evidence in the record to support personal jurisdiction." *Id*. at *2.

Ex. 8.  Imlive.com's "content" is primarily live performances by webcam performers, and performers from the referenced regions are presented in large numbers on the site.  (SAC ¶¶ 39, 40, 42-46.)

The Fogel Declaration states that Coolvision does not "engage in any marketing or advertising" and does not offer or provide an affiliate program.  Fogel Decl. ¶¶ 20, 21.  Exhibit 9 of the Abramson Declaration is a copy of an interview with Shay Efron, the Vice President of Sales, Marketing and Business development for imlive.com and its related sites, pussycash.com and webcamwiz.com.  Mr. Efron states that he was personally recruited by "the owner and founder of ImLive."  Abramson Decl., Ex. 9.  The interview makes clear that affiliate "white-label solutions" are driving his market.  Efron states in the interview that "Pussycash is one of the biggest and well-known affiliate programs in the industry, and the power behind its major webcam brands — Im-Live.com, Sexier.com and the dominate white-label generator WebcamWiz.com."  Perhaps, as Mr. Fogel states, Coolvision itself does not "provide" this affiliate program, but clearly some entity in its controlled group does.  The "owner and founder" referred to by Mr. Efron is Muly Litvak, the person identified as Coolvision's owner, and the "operator" of the imlive.com website, in the above-cited *Ha'aretz* article.  On his personal web page, Mr. Litvak takes credit for "ImLive" as a site he developed and is "especially proud of."  Abramson Decl., Ex. 10.

The Fogel Declaration states that Coolvision "has no business units" and "does not own any of the equipment that is used to run the website www.imlive.com."  Fogel Decl. ¶¶ 20, 21.  Yet, according to LinkedIn profiles,

Coolvision has a substantial "Network Operations Center" (NOC), as evidenced by five LinkedIn profiles of personnel in this center who self-identify as Coolvision employees.  Abramson Decl., Ex. 11.  It is reasonable to infer that a NOC of this size is running a substantial Internet infrastructure.

Finally, Mr. Fogel submitted a declaration in the *Ventura* case against Sobonito, which Coolvision filed in support of a motion to transfer venue to Cyprus.  The case alleged copyright infringement in the U.S. by Coolvision-managed adult sites.  In this declaration, Mr. Fogel, seeking to emphasize (rather than minimize) Coolvision's role, attested to its responsibility for "administration and monitoring" the accused web sites, and its control of all persons with knowledge of such administration and relevant documents.  Abramson Decl., Ex. 7 ¶¶ 1, 3.  It is reasonable to infer, based on the parallels between the cases, and Mr. Fogel's identical admissions of Coolvision's responsibility for "administration and monitoring" in both cases, that the operational circumstances here are comparable to those in *Ventura*.

Thus, the uncontroverted allegations of the SAC, Mr. Fogel's admissions of Coolvision's administrative role, and the other evidence summarized above paint a picture of a collective enterprise, run in Tel Aviv by Coolvision, through the commonly owned and controlled companies Sobonito and IML, to operate the accused infringing websites in the U.S.

**D. Coolvision Purposefully Directed Activities at Residents of New Jersey and the United States**

It is clear from uncontroverted allegations, and documents submitted herewith, that Coolvision has more than sufficient control over the accused websites to be charged with the infringement that takes place through those sites.

The admitted fact that Coolvision administers and maintains the infringing websites, coupled with uncontroverted allegations and further evidence that Coolvision also designed those websites, and manages, directs, and financially benefits from them, establishes everything necessary for liability. This is sufficient to establish a prima facie case of personal jurisdiction. *See Civix-DDI, LLC v. Cellco P'ship*, 387 F. Supp. 2d 869, 884 (N.D. Ill. 2005) ("alleged infringer uses a claimed system when the alleged infringer exercises control over the system and obtains beneficial use of the system").

**E. The Assertion Of Personal Jurisdiction Is Reasonable And Fair**

Coolvision contends that exercise of personal jurisdiction would "violate fundamental notions of fair play and substantial justice." DBR at 67-68 (internal quotations omitted). However, "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477-78. Coolvision makes no effort to make such a case, and therefore its contention on this point must be rejected. Nor is there anything unfair or unreasonable about making this multi-million dollar enterprise respond to a claim of infringement involving servers that

it admittedly administers, and clearly is responsible for operating, only a short distance from this Courthouse.

**F.  If The Court Concludes That WAG Has Not Made A Prima Facie Case for Personal Jurisdiction, It Must Be Permitted To Take Jurisdictional Discovery**

WAG has shown conclusively that the allegations of the SAC are sufficient to bestow the Court with jurisdiction over Coolvision.  If it had not done so, WAG would certainly be entitled to take jurisdictional discovery.  "If a plaintiff presents factual allegations that suggest 'with reasonable particularity' the possible existence of the requisite 'contacts between [the party] and the forum state,' the plaintiff's right to conduct jurisdictional discovery should be sustained." *Toys "R" Us v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003).  At a minimum, that is the case here. *See also Quality Int'l Packaging, Ltd. v. Chamilia Inc.,* No. 13–5235, 2014 WL 2465262, at *4 (D.N.J. May 30, 2014) (granting expedited jurisdictional discovery where factual allegations suggested alter ego relationship with reasonable particularity).[38]

---

[38] If that discovery is necessary, then while it is underway, the Court may simply hold the motion to dismiss in abeyance as to Coolvision.  *See, e.g., In re Automo. Refinishing Paint Antitrust Litig.*, No. 1426, 2002 WL 31261330, at *9 (E.D. Pa. July 31, 2002).

**POINT VIII.   WAG'S COMPLAINT SUFFICIENTLY ALLEGES JURISDICTION AND VENUE OVER DEFENDANT RADVINSKY AND HIS CORPORATIONS**

Leonid Radvinsky and each of the corporate defendants in Case No. 14-cv-03196, MFCXY, Inc., LRAM Company B.V., Cybertania, Inc., and ActiveSoft, Inc. (collectively, "MFC" or the "MFC Defendants"), also move to dismiss on the basis of personal jurisdiction and venue.

The MFC Defendants seek to distract the focus away from the salient facts and legal authorities with another red herring argument, this time on "general jurisdiction."  WAG has not alleged general jurisdiction.  The issue is specific jurisdiction, which these Defendants hardly address, but for which there is overwhelming support, both within the four corners of the complaint and otherwise.

In support of their motion, the MFC Defendants have submitted a short declaration by Mr. Radvinsky, containing carefully limited denials, which primarily go to the bogus issue of general jurisdiction, and state unremarkable facts, such as that his corporate entities have bank accounts and file tax returns. Mr. Radvinsky's extremely limited and barebone denials fail to address the substance of the extensive allegations that make him and the remainder of the MFC Defendants subject to jurisdiction in this venue.

**A. WAG Sufficiently Alleges Specific Jurisdiction over The MFC Defendants**

As noted above, the test for specific jurisdiction is (1) whether the defendant purposefully directed activities at residents of the forum; (2) whether the claim

arises out of or relates to those activities; and (3) whether assertion of personal jurisdiction is reasonable and fair." *Akro*, 45 F.3d at 1545–46. All three parts are met here.

### 1. MFC Purposefully Directed Activities at Residents of New Jersey.

It is alleged (FAC ¶ 20), and uncontroverted, that the MFC Defendants are responsible for operating the infringing websites located at www.myfreecams.com and its related variants. These are the type of websites that lead to findings in favor of personal jurisdiction. But the evidence does not stop there, by any means. On top of this are further purposeful contacts with New Jersey clearly related to Defendants' infringing online services. These will be addressed in turn, starting with the MFC Defendants' web sites.

### (a) MFC's Web Sites

The Third Circuit has stated that the "seminal authority" concerning the exercise of personal jurisdiction based on operating a web site is *Zippo Manuacturing. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997). *Toys "R" Us, Inc.*, 318 F.3d at 452 (applying the test for personal jurisdiction set forth in *Zippo*).

Defendants' brief is "zippo" on *Zippo* — it does not even cite the case. But under the *Zippo* test, MFC's infringing web sites ***alone*** are sufficient to subject those persons responsible for their operation to personal jurisdiction.

Under *Zippo*, the propriety of exercising jurisdiction depends on where on a sliding scale of commercial interactivity the web site falls. In cases where the

defendant is clearly doing business through its web site in the forum state, and where the claim relates to or arises out of use of the web site, personal jurisdiction exists. *Toys*, 318 F.3d at 452 (*citing* Zippo). The exercise of personal jurisdiction is proper where the commercial web site's interactivity reflected "specifically intended interaction with residents of the forum state." *Id*.

To meet this "interactivity" requirement, courts require "something more" than a mere Internet advertisement "to indicate that the defendant purposefully (albeit electronically) directed his activity in a substantial way to the forum state." *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418 (9th Cir. 1997).[39] The "something more" need not be much. For example, in *Zing Bros., LLC v. Bevstar, LLC*, No. 2:11-cv-00337 DN, 2011 WL 4901321 (D. Utah Oct. 14, 2011), the court relied on the inclusion of the forum state in a drop-down menu on the order page, and evidence that orders were solicited anywhere "inside the USA," as sufficient to establish that the site was "something more" than a mere "non-targeted transaction site." *Id*. at *3. *Zippo* itself stated that a defendant "clearly does business over the Internet," and "personal jurisdiction is proper" where "the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet." 952 F. Supp. at 1124. This is precisely the nature of MFC's web sites.

---

[39] The Federal Circuit has acknowledged but not ruled, on this approach rule as well. *Trintec Industries, Inc. v. Pedre Promotional Prods., Inc.* 395 F.3d 1275, 1281 (Fed. Cir. 2005). In the absence of such direct authority, it is appropriate to look at Third Circuit and other regional circuit authority. *See Oticon, Inc. v. Sebotek Hearing Sys., LLC*, 865 F. Supp. 2d 501, 506 (D.N.J. 2011).

MFC's sites are at the high end of interactivity, they integrally involve repeated transmission of streaming programs over the Internet for pay, and they actively involve residents of the forum state.  (FAC ¶¶ 19-22.)Performers ("models") sign up with MFC and perform online, with their performances distributed to massive audiences by the MFC Defendants.  MFC claims to be "the largest webcam site in the world" with "over 100,000 registered models" (FAC ¶ 21).  Many of the models are in New Jersey.  (FAC ¶ 42.)  The FAC cites numerous examples of such New-Jersey based performers by name, and notes 300 "hits" on references to New Jersey on myfreecams.com — and this includes only those New Jersey performers who publicly state their whereabouts, which is not mandatory.  The foregoing are just the performers.  The ordinary users are much more numerous.  MFC claims "over 30 million unique visitors per month" and "over 15 million registered members."  (FAC ¶ 21.)  These users register on the site, buy "tokens" with their credit cards (FAC ¶ 19), and use these tokens to pay for and tip performers in intimate, interactive online sessions with them (*e.g.*, FAC ¶¶ 22, 32).  WAG alleges that a substantial portion of the MFC Defendants' hundreds of millions in revenues derive from money spent by New Jersey residents on their sites.  (FAC ¶¶ 21, 37, 39.)

Defendants do not controvert any of the above allegations, so they must be taken as true.  *Jakks Pac.*, 2011 WL 6934856, at *3.  In any case, the truth of the foregoing allegations is manifestly obvious from even a casual inspection of the myfreecams.com web site.  Furthermore, unlike the defendants in some cases, the MFC Defendants do not assert that their web sites are provided exclusively in a

foreign language or are otherwise unsuitable for interaction with New Jersey residents (*see, e.g., Toys*, 318 F.3d at 454), or that they screen out users from New Jersey (*see Zippo*, 952 F. Supp. at 1126-17) (noting that the defendant "could have chosen not to sell its services to Pennsylvania residents").  Indeed the abundance of New Jersey-based performers on MFC's sites (users in themselves, as well as the content providers for MFC's infringement) strongly suggests that New Jersey residents are as well-represented per capita as anyone else in MFC's user base. This is something "way more" than a non-targeted Internet advertisement site.

It is quite clear, therefore, based on uncontroverted allegations, that myfreecams.com and its sister sites are the epitome of what are considered "interactive" web sites under the *Zippo* analysis, with the "something more" in numerous elements including performers and users in New Jersey.  Their very availability and use by New Jersey residents creates a basis for exercising personal jurisdiction over whoever is responsible for the infringing activities of these sites. In addition, there are contacts that go beyond the mere web sites.

### (b)  MFC's Additional "Purposeful Availment"

A court may also consider the defendant's related non-Internet activities as part of the "purposeful availment" analysis in connection with a cause of action arising from the operation of a web site.  *Toys*, 318 F.3d at 453.  "Where a plaintiff's claims 'arise out of or are connected with the [defendant's] activities within the [forum] state,' the defendant ordinarily should reasonably anticipate being 'haled into court' in the forum."  *Zumbro, Inc. v. Cal. Nat. Prods., Inc*., 861

F. Supp. 773, 778 (D. Minn. 1994) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)).

### i.   Sponsorship of New Jersey Trade Shows

It is uncontroverted that from 2010 to 2014, the MFC defendants have been physically present at a leading trade show held twice a year in New Jersey, to promote their infringing online service.  (FAC ¶ 39.)  Defendants were not just "present," but a major sponsor of these shows.  (*Id*.)  Exhibit A to the FAC includes screen shots of videos that the MFC Defendants have posted online, showcasing their participation at five of these shows, and a copy of the cover of a recent show brochure showing their sponsorship.  The FAC alleges the purpose of these shows is "to promote MFC's infringing services to prospective New Jersey users and also to recruit webcam performers from New Jersey."  (*Id.*)

MFC argues that these trade shows are not targeted at New Jersey, citing other show locations including Chicago and Florida.  DBR at 79; Radvinsky Decl. ¶ 35.

Clearly the purpose of attending these shows was to promote the myfreecams.com web site, accused herein of infringement.  The question is whether it is a reasonable inference that in attending the New Jersey shows, MFC sought to avail itself of promoting its services to New Jersey users and performers. *Iqbal*, 556 U.S. at 679 (A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the ***reasonable inference*** that the defendant is liable for the misconduct alleged.") (emphasis added.)

On the latter score, MFC weakly asserts that, rather than seeking to promote any business with New Jersey residents, "the referenced trade show is a national trade show and the attendance is not limited to New Jersey, nor directed towards any geographic region."  DBR at 79.  It strains credulity to suggest that this show had no business objectives in New Jersey.  The reasonable inference is that MFC's sponsorship of these shows included the objective of developing the business for its online service in New Jersey.  The fact that the same show is conducted elsewhere reasonably supports the regional significance of each show.

Where a defendant seeks a "nationwide audience," which includes the forum state, there is no unfairness in calling it to answer for its alleged infringement wherever a substantial number of its website users and performers are regularly operating and transacting business.  *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984) (where defendant "produce[d] a national publication aimed at a nationwide audience", "[t]here is no unfairness in calling it to answer for the contents of that publication wherever a substantial number of copies are regularly sold and distributed").

Further, there is evidence that this trade show had a very substantial interest in reaching local users and performers.  The most recent show, for example, held in Edison New Jersey on November 8-9, 2014, had full-size billboards erected both North and South of Exit 10 on the New Jersey Turnpike — hardly a rational expenditure unless the organizers were making a substantial effort to address the

local user and performer base and attract them to the show off that exit.[40]  The logical inference is that MFC goes out of its way to promote its business in New Jersey venues because New Jersey represents a substantial source of talent and revenue to its nationwide business.

### ii.    Induced Infringement in New Jersey

Plaintiff's counts of induced infringement allege that Defendants act to induce end users to commit direct infringement.  For each end user in New Jersey, this includes acts of direct infringement in New Jersey induced by Defendants' conduct.  Inducing infringement in the forum state is cognizable as a basis for asserting personal jurisdiction.  *See Pactool Int'l Ltd. v. Kett Tool Co.*, No. C06-5367, 2011 WL 834151, at *5 (W.D. Wash. Mar. 3, 2011) (injury resulting from induced infringement occurred where underlying direct infringement took place).

### 2.  WAG's Claims Arise Out Of or Relate to MFC's Activities.

The remaining two prongs of the Federal Circuit's test for specific jurisdiction are easily met.  As already noted, WAG's claims arise out of the MFC Defendants' infringing websites.  Further, the MFC Defendants' presence at the Exxxotica Expos is intended to drive traffic to, and to recruit performers for, those sites.

---

[40] See Abramson Decl., Ex. 12 (Twitter posting and photograph of one such billboard).

### 3.   The Assertion of Personal Jurisdiction Is Reasonable And Fair.

As to the third prong, the assertion of personal jurisdiction over the MFC Defendants is reasonable and fair because WAG's and New Jersey's interests in the litigation substantially outweigh any burden on MFC.  "A State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors."  *Burger King*, 471 U.S. at 473.  Nor have the defendants shown that it would be improperly burdensome to require them to defend themselves in a state that they intentionally visit twice a year. "[Defendants'] admitted presence at numerous trade shows in Nevada indicates that, despite their arguments to the contrary, neither company faces a particularly onerous burden in defending itself in Nevada."  *Patent Rights Protection Grp., LLC v. Video Gaming Techs., Inc.*, 603 F.3d 1364, 1370 (Fed. Cir. 2010).

For the foregoing reasons, and based on the above uncontroverted factual allegations and attached affidavits, WAG has sufficiently demonstrated that specific jurisdiction exists as to whomever is responsible for operating the accused web sites.  If the Court were to disagree, as discussed *supra*, WAG must be permitted to take discovery to demonstrate the existence of jurisdiction over the MFC Defendants.

### 4.   Mr. Radvinsky is Personally Subject to Jurisdiction

It should be clear from the above that WAG has amply demonstrated that specific jurisdiction exists as to whomever is responsible for operating the accused web sites.

Mr. Radvinsky is certainly not shielded from liability merely because he acted as an official of one or more corporations (if indeed he ever did so). *See Keeton*, 465 U.S. at 781 n.13 ("[W]e . . . reject the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity."); *Calder v. Jones*, 465 US 783, 790 (1984).

Mr. Radvinsky's personal responsibility here may be based either on establishing alter ego liability, which is specifically alleged, (*see* FAC ¶¶ 44, 48, 51), or (without piercing the corporate veil) for tortious conduct (including patent infringement) in which he had substantial personal participation and control.

Illinois law provides for the personal liability of a corporate officer where he or she had substantial personal participation and control over a tortious act committed in the name of the corporation.  S*ee, e.g.*, *Veteran Supply Corp. v. Swaw*, 548 N.E.2d 667, 670 (Ill. App. Ct. 1989); *National Acceptance Co. v. Pintura Corp.,* 418 N.E.2d 1114, 1116-17 (Ill. App. Ct. 1981); *McDonald v. Frontier Lanes, Inc.*, 272 N.E.2d 369, 377 (Ill. App. Ct. 1971).[41]

--------

[41] Plaintiff has alleged that Illinois law controls the issue of Mr. Radvinsky's personal liability for these corporations.  Mr. Radvinsky is an Illinois resident, and all of the currently active corporations are incorporated in Illinois.  The MFC Defendants purport to dispute that Illinois law applies (DBR 76, n. 235) citing cases that have no relevance whatsoever, such as a case involving where a sale takes place, a consumer warranty case, and a case concerning charitable immunity. Defendants base their disagreement on the assertion that New Jersey applies the Restatements' "most significant relationship test," but fail even to argue how that test could point to New Jersey law, where the issue is the legal effect for an Illinois resident purportedly working for an Illinois corporation.  Since the relationship in question is between an individual in Illinois and a corporation incorporated in

Illinois law also provides more generally for any corporate liability to be passed on to a corporate official where the corporation has acted as the mere "alter ego" for the official, or where the corporate veil is pierced.  The conditions for piercing the corporate veil under Illinois law are  (1) there is such a unity of interest and ownership that the separate personalities of the corporation and the parties who compose it no longer exist, and (2) circumstances are such that adherence to the fiction of a separate corporation would promote injustice.  *Tower Investors, LLC v. 111 East Chestnut*, 864 N.E.2d 927, 941 (Ill. App. Ct. 2007). The first of these tests generally turns on evaluation of a series of "factors," including: "(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere façade for the operation of the dominant stockholders."  *Gass v. Anna Hosp. Corp.*, 911 N.E.2d 1084, 1091 (Ill. App. Ct. 2009).

---

Illinois, the relationship would appear to be wholly seated in Illinois, and this points strongly in favor of Illinois law.  If there is any counterargument, Defendants have failed to articulate it.  The MFC Defendants conclude their footnote by conceding that New Jersey law is the same as Illinois law in any case.

Mr. Radvinsky's declaration consists of a series of extremely limited statements mostly directed to denying general jurisdiction (*e.g.*, that he does not reside in New Jersey), and only scratches the surface of the allegations in the FAC. His bare recitations that the corporations "maintain[]" "corporate and business records" (¶¶ 9, 16, 23, 30), "bank accounts" (¶¶ 10, 17, 24, 31),[42] and "file tax returns" (¶¶ 11, 18, 25, 31), only address two of these factors in a limited manner, and completely fail to dispute the allegations that the corporations are undercapitalized (FAC ¶ 68), the non-functioning of other officers and directors (FAC ¶¶ 52, 53), failure to maintain arm's-length relationships among related entities by juggling ownership of domain names and trademarks (FAC ¶¶ 69-71), or that he uses these corporations as a mere façade.  He denies that he "personally" operates streaming media servers (Radvinsky Decl. ¶ 4).  However, he fails to deny his alleged sole and total beneficial ownership, direction, domination, and control of each and every activity of the MFC Defendants, including their media streaming infrastructure, as alleged in the FAC.

The FAC alleges that Mr. Radvinsky "personally directs and controls [the MFC Defendants'] infringing activity."  (FAC ¶ 44.)  It alleges that:

- Mr. Radvinsky is the "dominant personality" and "the only individual who has ever been held out as an executive-level officer of any of the [MFC] Defendant corporations."  (FAC ¶ 52.)

- MFC is managerially a "one-man" operation.  (FAC ¶ 53.)

---

[42] For example, he states that each company has its own accounts (e.g., ¶ 10), but this in no way denies moving money among the corporations and/or Mr. Radvinsky.  These statements are so limited as to be meaningless.

- Mr. Radvinsky "is the only person who has ever been quoted in any news release concerning the MFC sites."  (FAC ¶ 52.)

- He is the only person (other than individual webcam models) "who has spoken for or otherwise been mentioned by name in connection with the adult industry awards that have been given to MFC since 2010.  (*Id.*)

- When interviewed by the trade press, he has not "mentioned a single other employee of his enterprise.  (*Id.*)

- In a series of nine domain arbitrations concerning MFC, Mr. Radvinsky was on each occasion the sole representative appearing on behalf of MFC.  (*Id.*)

- He is exclusively named in Internet posts and complaints as the only manager mentioned from MFC.  (*Id.*)

- No individual other than Mr. Radvinsky can be found on LinkedIn or any other resume site as ever having worked for MFC, other than webcam models.  (FAC ¶ 53.)

In interrogatories in another action, signed personally by Mr. Radvinsky under penalty of perjury, Mr. Radvinsky identified only himself when asked to identify, as of the end of 2013, each of the employees of his corporate group, defined in that case in a manner that would include every entity named as a defendant in the present case.  (FAC ¶ 55.)

Mr. Radvinsky was personally sued and named as the responsible figure in four (4) prior actions against MFC for infringement, fraudulent "spamming," and breach of a settlement agreement (FAC ¶ 56), and was so named based on allegations there, as here, that he was the moving actor who authorized, controlled, directed, or had the ability to authorize, control, and direct the actions complained of, and therefore was individually responsible.  (FAC ¶ 58.)

Mr. Radvinsky and his domestic corporations share the same residential address.  (FAC ¶ 61.)  He has used other sham companies to register domain names.  (FAC ¶ 66.)

In each and every domain name registration, for each and every accused MFC Internet site, during the relevant period identified herein and up to the date this action was filed, Mr. Radvinsky was designated as the owner and as the "Administrative," "Technical" as well as "Billing" contact for the domain.  (FAC ¶ 66.)  Upon the filing of the MFC action herein, Mr. Radvinsky began changing all of the domain name registrations for the MFC web sites to hide his personal participation, reflecting consciousness of his guilt.  (FAC ¶ 73.)

Somehow, Mr. Radvinsky asserts in his brief that Plaintiff has failed to allege that Mr. Radvinsky has "personally induced infringement" or "actively and knowingly assist[ed] with the corporation's infringement."  DBR 77, n.237.  Given that Mr. Radvinsky is alleged (with considerable factual support) to be the *sole* authoritative official of MFC, and further alleged, with support of publicly accessible documents, to be the owner as well as "Administrative" and "Technical" contacts for the accused websites, and given that these allegations have not been controverted or even addressed by Mr. Radvinsky and therefore must be taken as true, these token denials ring exceedingly hollow.  *See McDonald v. Frontier Lanes, Inc.*, *supra*, which has facts striking similar to those here, with regard to a corporate officer's liability for tortious conduct:

> In this case Ceresa was the president, sole shareholder and manager of Frontier.  He owned and operated the business and its corporate acts or omissions could only be those participated in by him.  The acts and

omissions of Frontier giving rise to the negligence charged in this case were not isolated incidents brought about by conduct of an employee, for example, but were a part of the general mode of operation of the corporate business under Ceresa's sole power of direction and control.  We find, as a matter of law, that defendant Ceresa is personally liable for the negligence of the corporate defendant, Frontier, in this case.

272 N.E.2d at 377.

With respect to alter ego liability, addressing the second factor, that adherence to the fiction of a corporation would "promote injustice," the MFC Defendants state that WAG "has not alleged any fraud, injustice or similar wrongdoing here, nor does any exist."  DBR at 76.  This is hardly the case. Plaintiff has alleged a massive pattern of infringement, which is ongoing and intentional, and conduct whereby Mr. Radvinsky would leave a chain of undercapitalized corporations to absorb the resulting liability, without the assets to cover it.  *See Buckley v. Abuzir*, 8 N.E.3d 1166, 1180 (Ill. App. Ct. 2014) (allegations of trade secret misappropriation found "sufficient to meet the veil-piercing test's second prong [promoting injustice] for purposes of surviving … dismissal [motion]").

Based on the foregoing principles, *i.e.*, either direct officer liability or alternately, an alter ego theory, the allegations amassed here are more than sufficient factually to support a plausible allegation that Mr. Radvinsky bears responsibility for how the accused websites are operated, and accordingly for the infringement resulting therefrom.

**B. Venue in This District is Proper**

Mr. Radvinsky and the corporate MFC Defendants argue that venue in this district is improper — improper as to Mr. Radvinsky individually, and improper as to any of the corporate MFC Defendants as well.  They are incorrect.  28 U.S.C. § 1400(b) provides that a patent infringement suit "may be brought in the district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business."

To begin with, once it has found a basis for personal jurisdiction, under the overwhelming facts discussed above, the Court can simply put aside any separate venue argument on behalf of the corporate MFC Defendants.  In a patent infringement action, corporate venue is coextensive with the reach of personal jurisdiction.  *Hoover Grp., Inc. v. Custom Metalcraft, Inc.*, 84 F.3d 1408, 1410 (Fed. Cir. 1996) (for venue purposes, the "residence of corporate defendants in patent infringement actions is governed by 28 U.S.C. § 1391(c).").  Section 1391(c)(2) provides that "an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question."  28 U.S.C. § 1391(c).  Thus, a venue argument is a nonstarter for a corporation, such as the corporate MFC Defendants, which is subject to personal jurisdiction in the forum.

Mr. Radvinsky argues at length, as to venue over himself, based on the venue provision for individuals.  However, it is also the established law that

"venue for personal liability of a corporate officer/owner for acts of infringement by the corporation, whether or not the facts support piercing the corporate veil, may reasonably be based on the venue provisions for the corporation, 28 U.S.C. §§ 1400(b) and 1391(c)." *Hoover Grp.*, 84 F.3d at 1410; *see also Minnesota Mining & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1265 (Fed. Cir. 1985). Venue is based on the factual allegations in the complaint, taken as true, and the plaintiffs "need plead only 'ultimate facts that sufficiently allege venue so as to sustain the Court's jurisdiction.'" *Hoover Grp.*, 84 F.3d at 1410 (quoting *Minnesota Mining*, 757 F.2d at 1265); *see also Mike's Train House, Inc. v. Broadway Ltd. Imports, LLC*, No. 09-2657, 2011 WL 856306, at *4-5 (D. Md. Mar. 8, 2011) (detailed allegations that officer "owns, controls, and actively manages" the corporate defendant found sufficient for venue over the officer).

As discussed above, jurisdiction and venue are proper as to each MFC corporate defendant. WAG alleges – and Mr. Radvinsky does not dispute – that the MFC corporate defendants operate "under the direction and control" of Mr. Radvinsky, that MFC's constituent corporations are operated as a sole proprietorship of Mr. Radvinsky, that he "completely dominates every aspect of each of the Defendant corporations' existence and operations" including those related to the alleged infringement, and that he "uses his various corporations as mere agents to carry out his business operating tactics" by "interpos[ing] these entities, interchangeably, as his alter egos when he wishes to enjoy the advantages of incorporation." (FAC ¶¶ 18, 49, 51.) WAG further provides factual allegations and evidence of the manner in which Mr. Radvinsky interchangeably uses his

corporate alter egos when conducting the affairs of his online entertainment enterprise. (FAC ¶¶ 69-71, 73.) Finally, WAG alleges that Mr. Radvinsky is the "mastermind" responsible for "directing and controlling MFC's infringing activities"; that the MFC corporate defendants are "undercapitalized sham entities"; and that Mr. Radvinsky "habitually uses his corporations as part of a 'shell game,' to move around assets for his convenience and shield himself from accountability." (FAC ¶¶ 75-77.)

Significantly, Mr. Radvinsky is the only natural person at the executive level to represent the MFC enterprise in the media, in litigation, on its own MFC websites, and on other websites, *e.g.*, LinkedIn. (FAC ¶¶ 52-59.) Mr. Radvinsky is also the only natural person to be named as the owner and designated "Administrative," "Technical," and "Billing" contacts for each MFC website. (FAC ¶ 67.) Based on this access and level of control, WAG alleges – and Mr. Radvinsky does not dispute – that Mr. Radvinsky "unilaterally and personally controls all aspects of the operation of the MFC Internet sites." (FAC ¶ 67.) As in *Hoover Group*, WAG's allegations about Mr. Radvinsky's "ownership, control, and active management" of each MFC Defendant corporation provide a sufficient basis to find that venue is proper in this district as to Mr. Radvinsky. These uncontroverted allegations are far more than required to show that venue is proper under *Hoover Group*, 84 F.3d at 1410, and *Minnesota Mining*, 757 F.2d at 1265.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully request that the Court deny Defendants' motion.


Dated: December 19, 2014   Respectfully submitted,

          RONALD ABRAMSON
          DAVID G. LISTON
          LEWIS BAACH pllc
          The Chrysler Building
          405 Lexington Avenue
          New York, NY 10174

          By: s/ <u>Ronald Abramson</u>
            Ronald Abramson
          Tel: (212) 822-0163

          By: s/ <u>David G. Liston</u>
            David G. Liston
          Tel: (212) 822-0160
          *Attorneys for Plaintiff*